**John T.P. CALLAHAN and Linda R. Callahan, husband and wife, Plaintiffs,**

v.

**LANCASTER–LEBANON INTERMEDIATE UNIT 13, Lancaster County Children and Youth Social Service Agency, Dr. Richard Sherr, individually and as Executive Director of Lancaster–Lebanon Intermediate Unit 13, Stephen Sohonyay, individually and as Director of Lancaster County Children and Youth Social Service Agency, Kerry Stauffer, Curtis Elledge, Lisa Lantz, individually and in their official capacities as em-**

---

ployees of Lancaster–Lebanon Interme-
diate Unit 13, Greg Landis and James
Laughman, individually and in their of-
ficial capacities as employees of Lancas-
ter County Children and Youth Social
Service Agency, Defendants.

Civ. A. No. 93–CV–4250.

United States District Court,
E.D. Pennsylvania.

Dec. 5, 1994.

Steven P. O'Day, Lancaster, PA, for plaintiffs.

Stuart L. Knade, Harrisburg, PA, for defendants Lancaster–Lebanon Intermediate Unit 13, Sherr, Stauffer, Elledge, and Lantz.

Paul E. Smith, Wilkes–Barre, PA, for defendants Lancaster County Children & Youth Social Service Agency, Sohonyay, Landis and Laughman.

### OPINION AND ORDER

VAN ANTWERPEN, District Judge.

On August 6, 1993, plaintiffs, John and Linda Callahan, filed this action, individually and on behalf of their son Michael, alleging violations of 42 U.S.C. § 1983 ("§ 1983") and various state law tort claims[1] against all defendants. The gravamen of their charges is that they were temporarily wrongly deprived of custody of Michael because of unsubstantiated allegations of child abuse. The allegations were based on information obtained primarily through facilitative communication, a method of communicating with

autistic children. The defendants are the Lancaster–Lebanon Intermediate Unit 13, Dr. Richard Sherr, Executive Director of School; Kerry Stauffer, teacher; Lisa Lantz, teacher; and Curtis Elledge, teaching assistant. Other defendants are the Lancaster County Children and Youth Social Service Agency; Stephen Sohonyay, Director of Agency; Greg Landis, caseworker supervisor; and James Laughman, caseworker. All individual defendants are being sued both in their individual and official capacities. On November 15, 1993, Lancaster–Lebanon Intermediate Unit 13, and the individual teacher defendants, filed a Motion to Dismiss all charges against them, which this court denied in an order dated December 10, 1993. Presently before the court are the Motions of all defendants for Summary Judgment, filed on September 9 and 12, 1994, and the plaintiffs' responses to these motions, filed on September 20 and 26, 1994. This court has jurisdiction pursuant to 28 U.S.C. § 1331.

### I. FACTUAL BACKGROUND

Discovery in this matter is complete, and the essentially undisputed facts are as follows.[2]

Plaintiffs' son, Michael C. Callahan ("Michael"), has been diagnosed with severe autism and mental retardation. He is almost completely nonverbal in his communication. At the time of the events in question, Michael was 16 years of age and a student at defendant Lancaster–Lebanon Intermediate Unit 13 ("IU 13"). Defendant Lantz was Michael's teacher during the summer of 1992 and defendant Stauffer had been Michael's school year teacher since fall 1990. Defendant Elledge was the teaching assistant assigned to Michael during the 1992–93 school year while Michael was in Stauffer's class.[3]

In early 1992, several of the teachers and teaching assistants at IU-13, including defen-

---

**1.** Plaintiffs allege the following state law claims: negligence, intentional infliction of emotional distress, invasion of privacy, interference with the parent-child relationship, false imprisonment, and assault and battery.

**2.** Plaintiffs have no direct knowledge of many of the facts preceding February 9, 1993, when their child Michael was taken into protective custody and they have not disputed defendants' version of

these facts. We have noted any conflicts which do exist and resolved them in favor of plaintiffs.

**3.** At a meeting in June 1992 to discuss Michael's Individualized Education Plan, Michael's parents and school personnel agreed that Michael would be assigned a one-on-one assistant who would remain with him throughout the day.

dants Lantz, Stauffer, and Elledge, received training in a technique for working with persons suffering from autism called "facilitated communication" ("FC").[4] At the June 1992 Individualized Education Plan meeting, plaintiffs approved the use of FC with Michael.

During the summer of 1992, Michael's teacher, defendant Lantz, utilized FC to communicate with him. She believed during this time that Michael communicated to her through FC that his·father was abusing him. During the fall of 1992, through further communication with Michael utilizing FC, Lantz came to believe that the alleged abuse was sexual in nature. At some point in the fall, she relayed her thoughts to Rita Foster, the school social worker, who relayed the information to defendant Stauffer. Stauffer apparently thought that there was not enough information at that point to warrant a report to the Lancaster County Children and Youth Social Service Agency ("Agency") pursuant to the Pennsylvania Child Protective Services Law, 23 Pa.C.S.A. § 6311(a) and (b).[5] At Stauffer's direction, the teaching assistant, defendant Elledge, became the primary facilitator with Michael when FC was used with him. Defendants maintain that Elledge's facilitation with Michael led Elledge also to suspect, by early 1993, sexual abuse of Michael by his father, although the statements Michael made to Elledge were apparently somewhat inconsistent with those made to Lantz.[6]

Near the end of 1992, because other teachers at IU 13 had received reports of child abuse through FC from other students, Rita Foster contacted the defendant Lancaster County Children and Youth Social Service Agency to request clarification on when reports of abuse, particularly those obtained through FC, should be made pursuant to 23 Pa.C.S.A. § 6311. An Agency representative advised school personnel that information received through FC regarding possible abuse should be reported provided that it met several criteria. She indicated first that the communication should describe the alleged abuse in a somewhat detailed manner with regard to such particulars as time, place, or body parts involved. Second, the child should be able to convey the information consistently through more than one facilitator. The Agency also provided the school with anatomically correct drawings so school personnel could attempt to confirm any allegations of abuse independent of FC.

On February 9, 1993, Michael apparently came to school in an agitated state. In an attempt to elicit information from him through FC about what was troubling him,

---

4. FC is a technique by which a person, called a "facilitator," supports the hand or arm of a communicatively impaired individual, enabling the person to extend an index finger in order to point to or press the keys of a typing device and thus to communicate. It has been used primarily as a tool to communicate with people afflicted with autism, cerebral palsy and Down's Syndrome, as well as others labelled "intellectually or developmentally impaired." The technique was apparently first introduced in the United States in 1989. See "Facilitated Communication," Autism Society of America (September 1993).

5. The text of 23 Pa.C.S.A. § 6311(a) and (b) reads as follows:

§ 6311. Persons required to report suspected child abuse

(a) General rule.—Persons who, in the course of their employment, occupation or practice of their profession, come into contact with children shall report or cause a report to be made in accordance with section 6313 (relating to reporting procedure) when they have reason to believe, on the basis of their medical, professional or other training and experience, that a child coming before them in their professional or official capacity is an abused child. The privileged communication between any professional person required to report and the patient or client of that person shall not apply to situations involving child abuse and shall not constitute grounds for failure to report as is required by this chapter.

(b) Enumeration of persons required to report.—Persons required to report under subsection (a) include, but are not limited to, any licensed physician, osteopath, medical examiner, coroner, funeral director, dentist, optometrist, chiropractor, podiatrist, intern, registered nurse, licensed practical nurse, hospital personnel engaged in the admission, examination, care or treatment of persons, a Christian Science practitioner, school administrator, school teacher, school nurse, social services worker, day-care center worker or any other child-care or foster-care worker, mental health professional, peace officer or law enforcement official.

6. Rita Foster also maintains that at some point during this period Michael made statements of abuse to her when she facilitated with him.

defendants Elledge and Lantz[7] came to believe that Michael was distressed because he was in pain and that the cause of the pain allegedly was sexual abuse by Michael's father.[8] School personnel decided it was time to report the allegations, and Rita Foster relayed them to the Agency that day.

After receiving the phone call from Foster, Agency personnel discussed the situation with Judge James P. Cullen of the Lancaster County Juvenile Court.[9] Pursuant to the telephone conference, defendant caseworker James Laughman filed an emergency petition for Temporary Custody/Custody with Judge Cullen, and it was approved that same day. Michael was taken from his parents' home and into protective custody that evening.[10]

On February 11 and 12, 1993, at a hearing conducted by Judge Cullen, the court received testimony from defendants Lantz and Elledge and observed them facilitate with Michael. A medical examination conducted soon after Michael was taken into custody did not indicate any signs of abuse. The court decided, however, that Michael would remain in the custody of the Agency, pending another hearing. On April 13, 1993, the court conducted a hearing, at the request of the plaintiffs, to determine the admissibility of statements made through FC. Plaintiffs presented expert testimony challenging the validity of FC. At the close of the hearing, with the agreement of all parties, the Agency's petition for temporary custody was withdrawn and Michael was returned to the custody of his parents.

## II. STANDARD OF REVIEW

■ Rule 56(c) of the Federal Rules of Civil Procedure provides for summary judgment where the:

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

"The party moving for summary judgment must demonstrate that, under the undisputed facts, the non-movant has failed to introduce evidence supporting a necessary element of his case." *In Re Phillips Petroleum Sec. Litig.*, 881 F.2d 1236, 1243 (3d Cir.1989). To defeat summary judgment, the non-moving party must respond with facts of record that contradict the facts identified by the movant and may not rest on mere denials. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 321 n. 3, 106 S.Ct. 2548, 2552 n. 3, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)); *see also First Nat'l Bank v. Lincoln Nat'l Life Ins. Co.*, 824 F.2d 277, 282 (3d Cir.1987). The non-moving party must demonstrate the existence of evidence that would support a jury finding in its favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986).

## III. DISCUSSION

Section 1983 provides for the imposition of liability on any person who, acting under color of state law, deprives another of rights, privileges, or immunities secured by the Constitution or the laws of the United States. To state a claim under § 1983, the plaintiffs must show both that (1) the offending conduct was committed by a person acting under color of state law, and (2) that such conduct deprived the plaintiffs of rights secured by the Constitution of the United States. *Parratt v. Taylor*, 451 U.S. 527, 535, 101 S.Ct.

---

**7.** School defendants maintain that Elledge and Lantz facilitated with Michael separately that day with Foster and Stauffer as observers.

**8.** According to defendants, Michael allegedly communicated to school staff that he felt sore and stated, "John stuck d--k in my butt, want to go to hospital, I need a nurse." Defendants also allege that they used the anatomically correct pictures to confirm his allegations. They claim that Michael pointed several times to the buttocks area of a man in a picture when asked where he hurt.

**9.** The Agency personnel who spoke with Judge Cullen were defendant caseworker supervisor Greg Landis and Agency attorney David E. Alspach.

**10.** Defendant Laughman executed the Temporary Custody order, accompanied by two state troopers. Defendant teacher Lantz was also asked to accompany them in case it was necessary to facilitate with Michael.

1908, 1912–13, 68 L.Ed.2d 420 (1981), *overruled in part on other grounds, Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). In this case, no party disputes that defendants were acting under color of state law.

■ As an initial matter, we note that plaintiffs have brought claims against the individual defendants in both their official and individual capacities. Individual capacity suits seek to impose personal liability upon a government official; damages are recoverable from the official's personal assets. *See Kentucky v. Graham*, 473 U.S. 159, 166, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). To the extent that plaintiffs are suing the individual defendants in their official capacities, the claims are the equivalent of claims against the municipal agencies themselves. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Accordingly, we will discuss claims against the individual defendants in their individual capacities separately, while reserving discussion of their liability in their official capacities until the liability of the respective municipal agencies is discussed.

■ Generally, in a § 1983 action, the first issue to be determined is whether the plaintiff has sufficiently alleged a deprivation of a right secured by the Constitution. *See Baker v. McCollan*, 443 U.S. 137, 140, 99 S.Ct. 2689, 2692, 61 L.Ed.2d 433 (1979). However, when defendants assert the affirmative defense of immunity, as the defendants in this case have done, we must first determine whether they are entitled to such that defense.[11] *See Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *D.R. By L.R. v. Middle Bucks Area Vo. Tech. School*, 972 F.2d 1364, 1368 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993). Qualified immunity is ordinarily an issue of law to be determined by a court on a motion to dismiss or a motion for summary judgment. *See Anderson*, 483 U.S. at 646, 107 S.Ct. at 3042 ("... we have emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation."); *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738; *Czurlanis v. Albanese*, 721 F.2d 98, 108 (3d Cir.1983). This approach allows for the elimination of "meritless actions against public officials at the earliest possible stage in the litigation." *See Mitchell v. Forsyth*, 472 U.S. 511, 530, 105 S.Ct. 2806, 2817, 86 L.Ed.2d 411 (1985).

## A. QUALIFIED IMMUNITY

■ State officials performing discretionary functions are shielded from liability for civil damages insofar as their conduct does not violate clearly established constitutional rights of which a reasonable person would have known. *See Harlow v. Fitzgerald*, 457 U.S. at 818, 102 S.Ct. at 2738. The immunity is not absolute but rather balances the interest in allowing public officials to perform their discretionary functions without fear of suit against the public's interest in vindicating important federal rights. *See Lee v. Mihalich*, 847 F.2d 66, 69 (3d Cir.1988).

"[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action ... assessed in light of the legal rules that were 'clearly established at the time it was taken.'" *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (quoting *Harlow*, 457 U.S. at 818, 102 S.Ct. at 2738). The Court in *Anderson* explained that:

> The contours of the right must be sufficiently clear that a reasonable official would understand what he is doing violates that right. This is not to say that an

---

**11.** Several of the individual defendants have raised the defense of Good Faith Immunity pursuant to the Pennsylvania Child Protective Services Law, 23 Pa.C.S.A. § 6318. While this may be a defense to state law claims, it cannot immunize governmental employees from liability resulting from alleged violations of federal law. *See Good v. Dauphin County Social Services*, 891 F.2d 1087, 1091 (3d Cir.1989) (Pennsylvania Child Protective Services Law cannot be the basis for summary judgment in the defendants favor when liability is based on federal law); *Wade v. City of Pittsburgh*, 765 F.2d 405, 407–08 (3d Cir.1985). Therefore, our discussion regarding § 1983 will be limited to the applicability of the federal immunity doctrines raised by the defendants.

official action is protected by qualified immunity unless the very action in question has been declared unlawful, but it is to say the unlawfulness must be apparent.

*Anderson,* 483 U.S. at 635, 107 S.Ct. at 3037. The Third Circuit has not required a strict factual congruence between previous cases and the circumstances in which the defendant official acted, holding instead that,

> ... [s]ome but not precise factual correspondence to precedent would be required.... We expect officials to apply general, well-developed legal principles.... We have established that we have adopted a broad view of what constitutes an established right of which a reasonable person would have known, which requires us to undertake an inquiry into the general legal principles governing analogous factual situations, if any, and a subsequent determination whether the official should have related this established law to the instant situation.

*Stoneking v. Bradford Area School District,* 882 F.2d 720, 726 (3d Cir.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 835 (1990) (internal citations omitted); *see also Hicks v. Feeney,* 770 F.2d 375, 379–80 (3d Cir.1985), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 786, 102 L.Ed.2d 777 (1986). "The ultimate issue is whether, despite the absence of a case applying established principles to the same facts, reasonable officials in defendants' position at the relevant time could have believed, in light of what was in the decided case law, that their conduct would be lawful." *See Good,* 891 F.2d at 1092. Furthermore, "even where the officials clearly should have been aware of the governing legal principles, they are nevertheless entitled to immunity if based on the information available to them they could have believed their conduct would be consistent with those principles." *Id.* Qualified immunity is applicable even where officials "of reasonable competence could disagree" that such acts were objectively reasonable, *See Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986), and "as the qualified immunity defense has evolved, it provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Id.*

**1. Clearly Established Rights of Plaintiff**

■ Section 1983 "is not itself a source of substantive rights," but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor,* 490 U.S. 386, 393–94, 109 S.Ct. 1865, 1870, 104 L.Ed.2d 443 (1989). In combination with the Due Process Clause of the Fourteenth Amendment, § 1983 allows plaintiffs to assert three kinds of federal claims: (1) claims for the deprivation by state officials of any of the specific protections defined in the Bill of Rights; (2) claims under the substantive component of the Due Process Clause "that bars certain arbitrary, wrongful government actions, regardless of the fairness of the procedures used to implement them;" and (3) claims under the procedural component of the Due Process Clause relating to deprivations of life, liberty, or property without due process of law. *See Zinermon v. Burch,* 494 U.S. 113, 125, 110 S.Ct. 975, 983, 108 L.Ed.2d 100 (1990) (internal citations omitted).

In the body of their complaint, plaintiffs allege that all defendants violated essentially the same Constitutional rights. Specifically, plaintiffs allege that defendants' conduct:

> a. constituted an unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments;
>
> b. constituted an invasion of plaintiffs Michael and Mr. and Mrs. Callahan's right of privacy in violation of the Fourth, Ninth, and Fourteenth Amendments; and
>
> c. denied plaintiffs Michael and Mr. and Mrs. Callahan due process of law in violation of the Fourteenth Amendment by conduct that shocks the conscience.

*See* Complaint at ¶ 34. Plaintiffs' first claim appears to be of the first variety discussed above; that is, a claim alleging a deprivation by a state official of a specific protection defined in the Bill of Rights. Their third claim appears to allege a substantive due process violation. As to the second claim, we note that neither plaintiffs' complaint nor their subsequent pleadings give us any indication what specific principles of privacy may

be implicated. If plaintiffs meant to implicate their right of privacy with regard to the care and custody of Michael, we find this to be intertwined with their substantive due process claim. However, if it was plaintiffs' intention to convey that their interest in personal reputation was violated, this claim would probably be analyzed under the realm of procedural due process. *See Hodge v. Carroll County Department of Social Services,* 812 F.Supp. 593, 600 (D.Md.1992), *rev'd in part on other grounds, Hodge v. Jones,* 31 F.3d 157 (4th Cir.1994).

Since the determination of whether defendants are entitled to qualified immunity turns on plaintiffs' clearly established Constitutional and statutory rights at the time of the alleged violation, we will briefly discuss the legal standard behind each of these allegations in turn, although not in the order that they have been alleged. In the interest of thoroughness, we will analyze plaintiffs' privacy claim under a procedural due process framework, while noting that the substantive due process discussion is equally applicable. Furthermore, because plaintiffs have not alleged with more particularity than noted above the specifics regarding their Constitutional allegations, we will attempt to fill in the gaps.[12]

### a. Substantive Due Process

■ The substantive component of the due process clause "bars certain government actions regardless of the fairness of the procedures used to implement them ... [and thereby] serves to prevent governmental power from being 'used for purposes of oppression.'" *Daniels v. Williams,* 474 U.S. at 332, 106 S.Ct. at 665 (internal citations omitted). When determining whether an action violates a right protected by this element of the due process clause, the court must balance "the liberty of the individual" and "the

demands of an organized society." *In re Scott County Master Docket,* 672 F.Supp. 1152 (D.Minn.1987), *quoting Youngberg v. Romeo,* 457 U.S. 307, 320, 102 S.Ct. 2452, 2460, 73 L.Ed.2d 28 (1982).

■ Although plaintiffs have not specified, we infer that the substantive due process right to which they refer is the right to familial integrity. The Supreme Court has recognized an abstract fundamental liberty interest in familial integrity and privacy. *See Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972) (unwed father has fundamental right in the care and custody of children born out of wedlock with whom he maintained strong parental relationship); *Santosky v. Kramer,* 455 U.S. 745, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982) ("[F]reedom of personal choice in matters of family life is a fundamental liberty interest protected by the Fourteenth Amendment."); *see also Prince v. Massachusetts,* 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944) (parents have fundamental interest in the religious upbringing of children); *Meyer v. Nebraska,* 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923) (parents have a fundamental interest in the education of their children).

However, the Court has never held this right to be absolute or unqualified, *see, e.g., Lehr v. Robertson,* 463 U.S. 248, 256, 103 S.Ct. 2985, 2990, 77 L.Ed.2d 614 (1983) (relationship between parent and child merits constitutional protection in "appropriate cases"), and it has balanced it against the compelling government interest in the health, education, and welfare of children as future citizens. *See Santosky,* 455 U.S. at 766, 102 S.Ct. at 1401–02 (state has *parens patriae* interest in welfare of child); *Stanley,* 405 U.S. at 645, 92 S.Ct. at 1209–10 (state has the

---

**12.** We also note that neither defendants nor plaintiffs engaged in any discussion of what plaintiffs' clearly established rights may have been at the time of this incident, so we will attempt to discuss the scope of the rights as best we can. *See Davis v. Scherer,* 468 U.S. 183, 197, 104 S.Ct. 3012, 3020, 82 L.Ed.2d 139 (1984) (plaintiffs may overcome defendants qualified immunity only by showing that their rights were clearly established at the time of the conduct in issue); *Landstrom v. Illinois Department of Chil-*

*dren and Family Services,* 892 F.2d 670, 675 (7th Cir.1991) (It is plaintiff's burden to demonstrate that a Constitutional right was clearly established).

Furthermore, the determination of qualified immunity in the context of a § 1983 action is determined by the defendants' knowledge and compliance with **federal** Constitutional and statutory rights, not state statutes. *See Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 540–41, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985).

"right" and "duty" to protect minor children); *Lassiter v. Department of Social Serv.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 2159, 68 L.Ed.2d 640 (1981) (state has an "urgent interest" in the welfare of the child); *Myers v. Morris*, 810 F.2d 1437, 1462 (8th Cir.1987), *cert. denied*, 484 U.S. 828, 108 S.Ct. 97, 98 L.Ed.2d 58 (1987) (constitutionally protected interest in family relations is limited by compelling government interest in protection of minor children, particularly in circumstances where protection may be necessary as against the parents themselves); *Lossman v. Pekarske*, 707 F.2d 288, 291 (7th Cir.1983) ("When a child's safety is threatened, that is justification enough for action first and hearing afterward.").

The weight of parents' interest in the care and custody of their child balanced against the state's interest in the protection of the child from harm naturally leaves a court engaged in this type of inquiry in a quandary as to what plaintiffs' clearly established rights may be in a particular situation. *See Anderson*, 483 U.S. at 639, 107 S.Ct. at 3038–39 (many general Constitutional rights, such as the right to due process of law, are clearly established and yet so general that it often will be unclear whether particular conduct violates the right). It is for this reason that many courts have found that, in the context of child care workers investigating and bringing child abuse proceedings, there are no "clearly established" substantive due process rights held by parents.

In *Frazier v. Bailey*, 957 F.2d 920 (1st Cir.1992), the First Circuit noted that, since *Harlow*, "lower courts that have applied this [qualified immunity] doctrine in cases involving alleged child abuse have concluded that it cannot be 'objectively reasonable' to expect public officials to know that their conduct violated a generalized right to 'familial integrity.'" *Id.* at 931. The court continued, stating,

> [s]uch cases require a more fact-specific inquiry into whether the defendants' actions violated a particularized, 'clearly established' constitutional right. . . . The courts have also emphasized the amorphous nature of a liberty interest in familial relationships. Because this interest

must always be balanced against the government interest involved, it is difficult, if not impossible, for officials to know when they have violated 'clearly established' law. *Id.* (internal citations omitted). The First Circuit concluded that "the dimensions" of the right of family integrity "have yet to be clearly established." *Id.* Therefore, because the defendants were not on notice of the reaches of the right, they were entitled to qualified immunity as a matter of law. *Id.*

In *Hodorowski v. Ray*, 844 F.2d 1210 (5th Cir.1988), plaintiffs also argued that child care workers were not entitled to qualified immunity because the workers' removal of plaintiffs' children from their home without a prior court order violated the plaintiffs' right to familial integrity. The Fifth Circuit squarely rejected this argument, noting the "nebulous" nature of the constitutional right of family integrity:

> It is beyond dispute that many aspects of family integrity possess constitutional stature. But reasonable government officials, knowing only that they must not infringe on family integrity, would not necessarily know just what conduct was prohibited. In particular, in the absence of any more fact-specific authority, we do not think that appellants in this case should have known that their conduct in removing the Hodorowski children from the home violated the nebulous right of family integrity.

*Id.*; *see also Hodge v. Jones*, 31 F.3d 157, 167 (4th Cir.1994) ("To expect Defendants to resolve what reasonable jurists have long debated—namely the precise strictures of the penumbral right of familial privacy, cast in the sweeping language of the Supreme Court cases cited by the district court, especially in the face of a legitimate state interest such as the effective detection and prevention of child abuse—is to impose burdens and expectations well beyond their reasonable capacities"); *Doe v. State of Louisiana*, 2 F.3d 1412, 1418 (5th Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (social workers entitled to qualified immunity because rights of family integrity under the Fourteenth Amendment not clearly established); *Landstrom*, 892 F.2d at 676 (defendants entitled to qualified immunity

because plaintiffs cite no cases indicating what clearly established rights have been violated); *Hidahl v. Gilpin County DSS*, 938 F.2d 1150, 1155 (10th Cir.1991) (defendants entitled to qualified immunity because plaintiffs have presented no case law to support their contention that conduct of defendants violated a clearly established constitutional or statutory right); *Stem v. Ahearn*, 908 F.2d 1 (5th Cir.1990), *cert. denied*, 498 U.S. 1069, 111 S.Ct. 788, 112 L.Ed.2d 850 (defendants entitled to qualified immunity because plaintiffs have not established that any clearly established right was violated); *Myers*, 810 F.2d at 1461, n. 18 (stating that "neither the Supreme Court nor any other circuit has addressed the application of the fourth or fourteenth amendments in the context of a child abuse investigation" and holding that defendants were therefore entitled to qualified immunity); *Fittanto v. Klein*, 788 F.Supp. 1451, 1458 (N.D.Ill.1992) (law concerning child abuse workers and children who may have been sexually abused is no clearer today than when *Myers* decided; consequently, defendants entitled to qualified immunity); *Daryl H. v. Coler*, 801 F.2d 893, 908 (7th Cir.1986) (holding that where the constitutionality of child abuse workers' procedures cannot be determined, plaintiffs cannot maintain that defendants should have known that their actions violated a clearly established constitutional right).

As we indicated earlier, plaintiffs cite to no case law, in their response to summary judgment, to support their contention that any

"clearly established" rights of theirs were violated.[13] Instead, the gravamen of their complaint appears to be that their clearly established rights were violated because defendants "improperly rel[ied] on an alleged method of communication not generally accepted within the scientific, educational, or psychological communities....," *see Complaint* at ¶ 34, when they relied upon information obtained through FC in taking the actions that they did.

While we take note of the fact that FC has recently come under strong criticism in the scientific community,[14] it is not within the purview of this court to take that information into account at this time. Our sole task is to determine if there were any *legally* established norms at the time defendants took action that would have indicated to them that their reliance on FC in reporting child abuse would be a violation of plaintiffs' Constitutional or statutory rights.

An exhaustive search of the case law has revealed to us no even remotely analogous circumstances that would have put defendants on notice that their conduct at that stage of the proceedings might be violative of clearly established rights. In fact, if anything, the case law surveyed would benefit the defendants. It is well-established in the case law that child care workers are entitled to qualified immunity in the performance of discretionary functions. *See Robison v. Via*, 821 F.2d 913 (2d Cir.1987) (state trooper and assistant state attorney who removed child from home because of suspected abuse enti-

---

13. We note that many courts have held that this alone is sufficient basis for finding that no clearly established law exists. *See Hodge*, 31 F.3d 157, 167; *Hidahl*, 938 F.2d at 1155; *Frazier*, 957 F.2d at 931; *Landstrom*, 892 F.2d at 676.

14. *See* Dr. Bernard Rimland, *Facilitated Communication: Problems, Puzzles and Paradoxes: Six Challenges for Researchers*, Autism Research Review International, vol. 5, no. 4 (1991); Dr. Bernard Rimland, *Facilitated Communication: Now the Bad News*, Autism Research Review International, vol. 5, no. 4 (1991); Dr. Patrick J. Rydell, *Facilitated Communication: A Reason for Cautious Optimism*, The Autism Quarterly, 1st Quarter (1992); Michael Eberlin, et. al., *Facilitated Communication: A Failure to Replicate the Phenomenon*, 23 Journal of Autism and Developmental Disorders 507 (1993); Alan Hudson, et. al., *Brief Report: A Case Study Assessing the Validity*

*of Facilitated Communication*, 23 Journal of Autism and Developmental Disorders 165 (1993).

The American Academy of Child and Adolescent Psychiatry has issued the following policy statement on FC:

Facilitated Communication (FC) is a process by which a 'facilitator' supports the hand or arm of a communicatively impaired individual while using a keyboard or typing device. It has been claimed that this process enables persons with autism or mental retardation to communicate. Studies have repeatedly demonstrated that FC is not a scientifically valid technique for individuals with autism or mental retardation. In particular, information obtained via (FC) should not be used to confirm or deny allegations of abuse or to make diagnostic or treatment decisions.

Approved by Council, October 20, 1993.

tled to qualified immunity because it was objectively reasonable for them to believe that they violated no clearly established rights); *Frazier v. Bailey,* 957 F.2d 920 (1st Cir.1992) (child care workers entitled to qualified immunity because no clearly established rights of plaintiff violated); *Hidahl v. Gilpin County DSS,* 938 F.2d 1150 (10th Cir.1991) (social workers who filed a dependency and neglect proceeding were entitled to qualified immunity because allegations set forth in the complaint were not sufficient to show that defendants conduct violated clearly established rights); *Caldwell v. LeFaver,* 928 F.2d 331 (9th Cir.1991) (social worker and supervisor who removed children from father's custody because of suspected abuse and placed them in the temporary custody of mother in another state entitled to qualified immunity); *Stem v. Ahearn,* 908 F.2d 1 (5th Cir.1990) (child protective services workers were entitled to qualified immunity in action because plaintiff failed to show that workers had breached any clearly established constitutional or statutory right); *Daryl H. v. Coler,* 801 F.2d 893 (7th Cir.1986) (where constitutionality of child abuse workers' procedures cannot be determined, plaintiffs cannot maintain that defendants should have known that their actions violated clearly established rights; therefore, workers entitled to qualified immunity); *Hodorowski v. Ray,* 844 F.2d 1210 (5th Cir.1988) (child care worker who removed child from parents' custody due to suspected abuse entitled to qualified immunity because no clearly established rights existed); *Doe v. Hennepin,* 858 F.2d 1325 (8th Cir.1988), *cert. denied,* 490 U.S. 1108, 109 S.Ct. 3161, 104 L.Ed.2d 1023 (1989) (absent showing of "malice or improper motives," county welfare agency officials entitled to qualified immunity from damages claims arising out of the removal of plaintiffs' children from their home for 16 days due to suspected child abuse); *van Emrick v. Chemung County Dept. of Social Serv.,* 911 F.2d 863 (2d Cir.1990) (caseworkers who removed child from custody of parents pursuant to court order during child abuse and then allowed x-rays of child to be taken entitled to qualified immunity because no clearly established rights existed); *Doe v. State of Louisiana,* 2 F.3d 1412 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994) (case worker and supervisor entitled to qualified immunity because case law in area not clearly established); *Doe v. Connecticut Dept. of Children and Youth Services,* 712 F.Supp. 277 (D.Conn.1989), *aff'd,* 911 F.2d 868 (2d Cir.1990) (social workers who initiated child abuse investigation and removed child from parents' custody were entitled to qualified immunity because they had a reasonable basis to believe that there was ongoing abuse); *Pauli v. Farmington Cent. Com. School Dist. 265,* 841 F.Supp. 840 (C.D.Ill.1994) (school officials entitled to qualified immunity with regard to claim that officials' placement of son in foster home violated parent's constitutional rights); *Fittanto v. Klein,* 788 F.Supp. 1451 (N.D.Ill. 1992) (social workers entitled to qualified immunity because child was removed from home on a good faith belief that he was being abused); *Millspaugh v. Wabash County Dept. Public Welfare,* 746 F.Supp. 832 (N.D.Ind.1990), *aff'd,* 937 F.2d 1172 (7th Cir. 1991) (county child welfare worker who initiated petitions for removal of child from mother's custody entitled to qualified immunity because plaintiff did not identify what clearly established rights had been violated); *Roman v. Appleby,* 558 F.Supp. 449 (E.D.Pa. 1983) (school personnel who conducted interviews with student and thereafter reported matter to county services entitled to qualified immunity); *Landstrom v. Illinois Department of Children and Family Services,* 699 F.Supp. 1270 (N.D.Ill.1988), *aff'd* 892 F.2d 670 (7th Cir.1990) (school employees who removed child from classroom to both question her about possible child abuse and to give her a physical examination were nevertheless entitled to qualified immunity); *Chayo v. Kaladjian,* 844 F.Supp. 163 (S.D.N.Y.1994) (child care workers who removed children from home based on allegations of abuse and allowed medical exam with x-rays to be conducted, entitled to qualified immunity).

The only case we have found that has more specific applicability to the unique situation before us also dictates against the plaintiffs' position. In *Myers v. Morris, supra,* the Eighth Circuit discussed the issue of techniques used to interview children that had allegedly been sexually abused. Plaintiffs in

*Myers* alleged that defendants, among other things, used interviewing methods so flawed that they inevitably produced false and misleading accusations. *Id.* at 1444–45. The Eighth Circuit found that the "interviewing conduct occurred in a grey area of investigative procedure as to which there were, and probably still are, less than clearly established legal norms...."[15] and noted that "[t]he nature and extent of permissible interrogation is but one of many unsettled questions in the context of a child abuse investigative procedures." *Id.* at 1461. *See also Hodge,* 31 F.3d at 167 ("this would be a proper case for the application of qualified immunity because officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines.") (internal citations omitted). The court thus concluded that since the standards for the interrogation of juvenile witnesses and victims in the area of child abuse were not clearly established, defendants were entitled to qualified immunity. *Id.*

We find the policy of the general case law and more specific holding in *Myers* to be applicable to our case. As in *Myers,* we have at issue a technique of questionable validity utilized in the context of child abuse investigations. We believe that when it was employed by defendants, FC has its share of critics and supporters, and thus presented a seminal "grey area" situation. Finding no case law regarding its use, and given the unsettled nature of the method in general, we find that at the time in question there existed no clearly established substantive due process right that could have been violated.

### b. Procedural Due Process

■ Since we have already discussed plaintiffs' right to privacy under the substantive component of the Due Process Clause, we will briefly analyze it under a procedural due process framework. In order to allege a claim under the procedural arm of the Due Process Clause, plaintiffs must demonstrate that: (1) there has been a deprivation of liberty or property in the constitutional sense; and (2) the procedures used by the state to effect this deprivation were constitutionally inadequate. *In Re Scott County Master Docket,* 672 F.Supp. 1152, 1169 (D.Minn.1987), *aff'd, Myers v. Scott County,* 868 F.2d 1017 (8th Cir.1989). Procedural due process, then, is unlike substantive due process in that the constitutional violation "is not complete unless and until the State fails to provide due process." *Zinermon,* 494 U.S. at 125, 110 S.Ct. at 983. It is therefore necessary to inquire into the constitutional adequacy of the State's procedural safeguards. *Id.*

In determining the amount of process that a state must give, courts have consistently looked to the three-part test of *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1970), as their guide:

First, the private interest that will be affected by the initial action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal administrative burden that the additional or substitute procedural requirement would entail.

■ Applying these principles to the situation before us, there is no dispute that plaintiffs have a protected liberty interest in familial privacy. *See In re Scott County Master Docket,* 672 F.Supp. at 1169; *Hodge,* 31 F.3d at 163; *Bohn v. County of Dakota,* 772 F.2d 1433, 1435 (8th Cir.1985), *cert. denied,* 475 U.S. 1014, 106 S.Ct. 1192, 89 L.Ed.2d 307 (1986). As in the substantive due process context, however, this right is obviously not absolute and is balanced against the state's interest in protecting children reasonably suspected of being abused. *See Millspaugh,* 746 F.Supp. at 848; *In re Scott County Master Docket,* 672 F.Supp. at 1169.

---

**15.** "The grey area referred to involves the extent to which juvenile suspected child abuse victims may reasonably be questioned, particularly if they initially deny abuse, and the extent to which leading questions, confrontation with reports by others and photographs of suspects may be used." *Myers,* 810 F.2d at 1461.

■ The gist of plaintiffs' allegations in a procedural due process context, as we understand it, would be that they were deprived of their right of familial privacy without due process since their child was removed from them without any inquiry into the validity of FC as a reliable source of information. Plaintiffs can allege no Constitutional violation, however, unless the procedural safeguards offered by the state did not adequately protect their interests. We find that plaintiffs' interest were adequately protected and they therefore cannot allege a procedural due process violation.

Procedural due process is satisfied by the "opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews,* 424 U.S. at 333, 96 S.Ct. at 902. First, we generally note that the procedural safeguards afforded by the Pennsylvania Child Protective Services Law, 23 Pa.C.S.A. § 6301 et seq., adequately protect the interests of parents. *See Fanning v. Montgomery County Children and Youth Services,* 702 F.Supp. 1184, 1189 (E.D.Pa.1988) (23 Pa.C.S.A. § 6301 et seq., affects "a constitutionally sufficient balance of the strong interest of parents in the custody of their children and the risk of erroneous interference with that custody, on the one hand, and the state's interest in protecting minors from a potentially abusive environment on the other.").

Specific to plaintiffs' contention regarding the lack of due process vis-a-vis FC, we note that it is precisely the function of these procedural safeguards to protect against errors that were made in judgment during the investigation process. *See Ellis v. Hamilton,* 669 F.2d 510, 515 (7th Cir.1981), *cert. denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982) (Due Process not violated "if the state provides reasonable remedies for preventing families from being arbitrarily broken up by local domestic relations officers."). For instance, a child may not be held for more than 24 hours without a court order, *see* 23 Pa. C.S.A. § 6315(b), and a detention hearing must be held within 72 hours to determine whether protective custody is further warranted. *See* 23 Pa.C.S.A. § 6315(d). Michael was taken into protective custody pursuant to a court order and within 72 hours a hearing was held, with plaintiffs present, where it was determined that he would remain in protective custody. Furthermore, at plaintiffs' request, a hearing on the admissability of allegations received through FC was held and the petition for custody was withdrawn by the Agency. *See Ellis,* 669 F.2d at 514 (Due Process is not violated if state procedures exist to correct "inevitable errors" or "blunders" of local officials regarding custody matters). That the hearing was post-deprivation as opposed to pre-deprivation is not a violation of due process in this context. *See Id.* at 515; *In re Scott County Master Docket,* 672 F.Supp. at 1170. Nor is any general embarrassment suffered by plaintiffs during the course of the proceedings. *See Roman,* 558 F.Supp. at 461.

### c. Fourth Amendment

■ Plaintiffs also claim that the removal of Michael from parental custody was an unreasonable search and seizure in violation of established Constitutional principles under the Fourth and Fourteenth Amendments.[16] Plaintiffs only support for this contention is that which has already been discussed above; that is, defendants' reliance on the use of allegations obtained through FC in requesting a custody order from the court. The question before us is: Was it clearly established, at the time of defendants' actions, that it was unreasonable under the Fourth Amendment for defendants to apply for and then execute a court order for temporary custody based on information obtained through FC?

Turning to the specific context of child care workers, we find no Fourth Amendment case law, and plaintiffs have cited none, that would have put defendants on notice that their actions would violate any existing clearly established rights. First, as we have already noted, we have found no case law that

---

16. The Supreme Court has expressed a preference that all cases arising under § 1983 that deal with the violation of plaintiffs' Constitutional rights that pertain to unreasonable search and seizure or arrest be dealt with exclusively under the Fourth Amendment. *Graham v. Connor,* 490 U.S. at 395, 109 S.Ct. at 1871; *Albright v. Oliver,* — U.S. ——, 114 S.Ct. 807, 809, 127 L.Ed.2d 114 (1994).

would even remotely indicate that defendants' reliance on FC in obtaining a custody order would violate any clearly established Constitutional principles.

Second, the weight of the law in the Fourth Amendment context, in fact, generally balances in favor of the defendants. Defendants in this case obtained a court order from the Juvenile Court, pursuant to which they took custody of Michael. Our survey of the law reveals that courts have regularly granted qualified immunity to child care workers who initially remove a child from the home *without* a court order. *See Robison*, 821 F.2d at 921 ("It is well established that officials may temporarily deprive a parent of custody in 'emergency circumstances' without parental consent or a **prior** court order.") (emphasis in original); *Lossman*, 707 F.2d at 291 ("When a child's safety is threatened, that is justification enough for action first and hearing afterward.").

 Even analogizing the situation at hand, that of a child care worker seeking, obtaining, and executing a temporary custody order, to a police officer seeking, obtaining, and executing an arrest warrant, we find no clearly established Fourth Amendment principles that would have indicated to the defendants that their actions were Constitutionally improper. *See Good*, 891 F.2d at 1094 ("The Fourth Amendment case law has developed in a myriad of situations involving very serious threats to individuals and society and we find no suggestion that the governing principles should vary depending upon the court's assessment of the gravity of the societal risk involved."); *Austin v. Borel*, 830 F.2d 1356, 1361 (5th Cir.1987); *Doe*, 712 F.Supp. at 282. It is well-settled that probable cause to arrest generally exists when a police officer makes an arrest pursuant to a warrant that meets the requirements of the Fourth Amendment. *See Baker*, 443 U.S. at 144, 99 S.Ct. at 2694; *Graham*, 490 U.S. at 389, 109 S.Ct. at 1868. Furthermore, law enforcement officers who arrest on the basis of such a warrant are usually immune from suits alleging a Constitutional violation. *Baker*, 443 U.S. at 143–44, 99 S.Ct. at 2694; *Graham*, 490 U.S. at 395, 109 S.Ct. at 1871; *Druckenmiller v. United States*, 548 F.Supp. 193, 194–95 (E.D.Pa.1982) ("The law is clearly established that law enforcement officers who effect an arrest pursuant to a facially valid arrest warrant are immune from suit alleging a constitutional deprivation.").

The only exception to this general rule is where the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable. In this case, the "shield of immunity" will be lost and the officer will be liable for damages under § 1983. *See Malley*, 475 U.S. at 344, 106 S.Ct. at 1097–98; *see also Lippay v. Christos*, 996 F.2d 1490 (3d Cir.1993) (where police officer submits affidavit in support of arrest warrant containing statements he knows to be false or would know to be false if he had not recklessly disregarded the truth, officer fails to observe right that was clearly established, and is not entitled to qualified immunity). Furthermore, even if "officers of reasonable competence could disagree on this issue, immunity should be recognized." *Malley*, 475 U.S. at 341, 106 S.Ct. at 1096.

In the case at hand, a temporary custody order was obtained by defendants from the Court of Common Pleas of Lancaster County. There have been no substantiated allegations made by plaintiffs that this order was obtained in bad faith or with "reckless disregard for the truth."[17] Consequently, we find that there existed no clearly established rights under the Fourth Amendment at the time of defendants' actions that would have put them on notice that their decision to apply for a custody order based on information obtained through FC, and their subsequent execution of that order, was wrongful.

17. The plaintiffs, in paragraph 42 of their complaint, generally allege maliciousness and "bad faith" on the part of all defendants. However, they fail to substantiate or further elaborate on these allegations in any way. The Supreme Court has held that unsupported allegations in pleadings are insufficient to raise a genuine issue of material fact and prevent grant of summary judgment. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). *See also Appelmans v. City of Philadelphia*, 826 F.2d 214 (3d Cir.1987); *Falcone v. Columbia Pictures*, 805 F.2d 115 (3d Cir.1986).

In sum, we hold that defendants are entitled to qualified immunity as a matter of law since our analysis has revealed that the Constitutional principles that govern the situation at hand are not clearly established.

### 2. Objective Reasonableness of Defendants' Actions

 Even if the contours of plaintiffs' federal rights were clearly delineated at the time of the acts complained of, defendants may enjoy qualified immunity if it was objectively reasonable for them to believe that their acts did not violate those rights. *See generally Hidahl,* 938 F.2d at 1154 ("A defendant in a § 1983 action is not required to anticipate changes in the law, and the reasonableness of his conduct is to be judged by the state of the law at the time of his conduct."). Although we have found that the individual defendants would be entitled to qualified immunity as a matter of law, we find on alternative grounds that even if plaintiffs did possess such rights, defendants would nevertheless be entitled to qualified immunity because their actions were objectively reasonable.

### a. Reasonableness of Defendants' Reliance on FC

 We first address the issue of FC. Plaintiffs argue that defendants' reliance on any information received through FC was objectively unreasonable since FC is "unreliable and invalid." *See* Complaint at ¶ 34. While it is not our function to express any scientific opinion as to the validity or invalidity of FC as a reliable means of communication, we do find from a legal perspective that, at the time in question, it was objectively reasonable for all defendants to have relied on allegations of child abuse received through FC. Our reasons for so finding are three-fold.

First, we note that when making a determination regarding the narrow issue of qualified immunity, it is our task to focus solely on the "objective *legal* reasonableness" of the defendants actions in light of existing case

law. *See Harlow,* 457 U.S. at 819, 102 S.Ct. at 2738–39 (emphasis added). As we have already stated, an exhaustive search of the case law has turned up absolutely no cases that would even remotely indicate to defendants that it was not legally reasonable for them to rely on information obtained through FC at their stage of the proceedings.

Second, although evidence obtained through FC has been deemed inadmissible in many state courts, the reporting requirements of the Pennsylvania Child Protective Services Law do not indicate that only reports based on evidence admissible in court can be made. In fact, the intent of the Law goes against that contention:

> Undoubtedly the purpose of the Child Protective Services Law is to bring about quick and effective reporting of suspected child abuse so as to serve as a means for providing protective services competently and to prevent further abuse of the children while providing rehabilitative services for them and the parents.... The law does not provide for legal determinations of abuse; it is mainly a vehicle for reporting abuse and bringing quickly into play those services (including court hearings) available through county protective service facilities for the care of the child.

*In Interest of J.R.W.,* 428 Pa.Super. 597, 631 A.2d 1019, 1022 (1993); *see generally Myers,* 810 F.2d at 1463 ("The 'reasonable belief' standard reflects a legislative policy in favor of vigorous and immediate child protection endeavors.").

Third, there is no dispute that plaintiffs gave permission for FC to be used with Michael in accordance with his Individualized Education Plan ("IEP").[18] Lantz and Elledge were trained, as were many other teachers who deal with autistic children, in the technique of facilitative communication at a seminar in early 1992. *See* Affidavit of Lisa Lantz. The use of FC with Michael was discussed with Michael's parents at a meeting in June of 1992 regarding his IEP. Michael's parents approved the use of FC with

---

**18.** There is also no dispute as to whether the alleged communications between Michael and his facilitators actually took place.

Michael at that meeting. *See* IEP Report. Accordingly, Lantz and Elledge were using FC with Michael in accordance with his IEP.

**b. Defendants Lantz, Elledge, and Laughman**

Plaintiffs allege that defendants Laughman, Lantz, and Elledge improperly relied "on an alleged method of communication not generally accepted within the scientific, educational, or psychological communities, thereby making said method unreliable and invalid. ..." *See* Complaint at ¶ 34.

■ As to Lantz and Elledge, we find that their actions were objectively reasonable and proper in light of their obligations under Pennsylvania law as child care workers. *See Caldwell,* 928 F.2d at 333 (defendants adherence to state statute has bearing on their objective reasonableness). Pursuant to the Pennsylvania Child Protective Services Law, 23 Pa.C.S.A. § 6311, certain persons, including school teachers, "who ... come into contact with children shall report or cause a report to be made ... when they have *reason to believe,* on the basis of their medical, professional, or other training and experience, that a child coming before them in their professional or official capacity is an abused child." 23 Pa.C.S.A. § 6311(a) (emphasis added). Defendants correctly point out that it is "suspected" rather than verified reports of child abuse that must be reported. *See Stoneking v. Bradford Area School District,* 856 F.2d 594, 600 (3d Cir.1988), *vacated on other grounds, Smith v. Stoneking,* 489 U.S. 1062, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989) (Act "reflects the state's broad policy 'to encourage more complete reporting of suspected child abuse and ... to provide protection for children from further abuse'"); *Brozovich v. Circle C Group Homes, Inc.,* 120 Pa.Cmwlth. 417, 548 A.2d 698, 700 (1988) (emphasis in original) ("[T]he Law requires the Circle C Appellees to immediately report *suspected* abuse.... The urgency of prompt reporting is stressed throughout the Law's provisions"). Furthermore, the policy behind the statute dictates that a person making a report is not required to have probable cause; rather, a "lesser quantum of evidence" is all that is necessary, *Roman,* 558 F.Supp. at 459, and there is no requirement of pre-report verification. *See Brozovich,* 548 A.2d at 700 (verification of allegations of abuse before reporting runs contrary to express purpose of the law).

Based on their FC training, Lantz and Elledge certainly had "reason to believe," then, that Michael was a possible victim of child abuse and, pursuant to the statute, were obligated to report the abuse. Furthermore, if they suspected abuse and failed to report it, they may have faced criminal penalties. *See* 23 Pa.C.S.A. § 6319.[19] *See also Chrissy F. By Medley v. Mississippi DPW,* 925 F.2d 844, 851 (5th Cir.1991) (allegation that welfare department workers failed to report or investigate allegations of child abuse was sufficient to charge violation of child's clearly established right of access to courts).

Lantz and Elledge properly reported the allegations to the appropriate school personnel. *See* 23 Pa.C.S.A. § 6311(c).[20] On February 9, they again facilitated with Michael

---

**19.** The text of 23 Pa.C.S.A. § 6319 reads as follows:

**§ 6319. Penalties for failure to report**
A person or official required by this chapter to report a case of suspected child abuse who willfully fails to do so commits a summary offense for the first violation and a misdemeanor of the third degree for a second or subsequent violation.

**20.** The text of 23 Pa.C.S.A. § 6311(c) reads in pertinent part:

**§ 6311. Persons required to report suspected child abuse**
&ast; &ast; &ast; &ast; &ast; &ast;
**(c) Staff members of institutions, etc.**—Whenever a person is required to report under subsection (b) in the capacity as a member of the staff of a medical or other public or private institution, school, facility or agency, that person shall immediately notify the person in charge of the institution, school, facility or agency or the designated agent of the person in charge. Upon notification, the person in charge or the designated agent, if any, shall assume the responsibility and have the legal obligation to report or cause a report to be made in accordance with section 6313. This chapter does not require more than one report from any such institution, school, facility or agency.

to determine what was troubling him. It is there that their involvement essentially ended, although defendant Lantz was asked to accompany Agency personnel to the Callahan household to facilitate with Michael if necessary. Lantz and Elledge did not make the report to the Agency but properly deferred this decision to their superiors. The information before us indicates, and plaintiffs have presented no evidence to the contrary, that, other than merely reporting their allegations to superiors, Lantz and Elledge had no involvement in the decision by the Agency to file for an emergency custody petition. Absent a showing of bad faith or malice on the part of the defendants in making the initial reports, which we do not believe plaintiffs have alleged,[21] we hold that defendants Lantz's and Elledge's actions were certainly objectively legally reasonable and hold them entitled to qualified immunity.

■ With regard to defendant Laughman, we hold that, at the time in question, his actions were also objectively reasonable. Defendant Laughman was the social worker who filed for a temporary custody order with the Juvenile Court. He received information from IU 13 indicating that Michael Callahan had alleged, through facilitative communication, that he was the subject of sexual abuse by his father. His supervisor and the Agency attorney were then parties to a phone conference with the Honorable James P. Cullen of the Juvenile Court of Lancaster County. Based on this conference, defendant Laughman was apparently asked to prepare and file with Judge Cullen a Petition for Temporary Custody/Custody. After the granting of the petition by Judge Cullen, defendant Laughman, along with defendant Lantz and two state troopers, went to plaintiffs' home and took Michael into protective custody.

Defendant Laughman acted pursuant to the Pennsylvania Child Protective Services Law. Based on its duties under 23 Pa.C.S.A. § 6368(a),[22] the Agency made a determination that Michael should not be left in the custody of his parents. Reports of child abuse must be investigated immediately by the Agency receiving the report. *See Id.* It was decided that a temporary custody petition would be filed. *See* 23 Pa.C.S.A. § 6370(b).[23] Michael was then removed from his home pursuant to 23 Pa.C.S.A. § 6369.[24]

---

21. Plaintiffs have intimated in various post-complaint pleadings an allegation of bad faith on the part of defendant Elledge. Specifically, plaintiffs hint that because they had not allowed Michael to accompany Elledge and other children to a community play shortly before February 9, there may have been some bad faith on the part of Elledge when he facilitated with Michael on February 9. *See* Deposition of John Callahan at 49–52.

We do not find that this intimation is sufficient to create a material issue of fact. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Hidahl,* 938 F.2d at 1154 ("Under *Harlow,* even an allegation of malice ... is insufficient to subject a defendant in a proceeding of this sort 'to the costs of trial or to the burdens of a broad reaching discovery.' ").

22. The text of 23 Pa.C.S.A. § 6368(a) reads in pertinent part:

§ 6368. **Investigation of reports**
(a) **General rule.**—Upon receipt of each report of suspected child abuse, the child protective service

shall commence within 24 hours an appropriate investigation which shall include a determination of the risk to the child or children if they continue to remain in the existing home environment as well as a determination of the nature, extent and cause

of any condition enumerated in the report and, after seeing to the safety of the child or children, immediately notify the subjects of the report in writing of the existence of the report and their rights pursuant to this chapter in regard to amendment or expungement.

\* \* \* \* \* \*

23. The text of 23 Pa.C.S.A. § 6370(b) reads in pertinent part:

§ 6370. **Services for protection of child at home or in custody**

\* \* \* \* \*

(b) **Initiation of court proceedings.**—In those cases in which an appropriate offer of service is refused and the child protective service determines, or if the service for any other appropriate reason determines, that the best interests of the child require court action, the child protective service shall initiate the appropriate court proceeding. The child protective service shall assist the court during all stages of the court proceeding in accordance with the purposes of this chapter.

24. The text of 23 Pa.C.S.A. § 6369 reads as follows:

§ 6369. **Taking a child into protective custody**

In appropriately carrying out the dictates of the state law, the decision was made to remove Michael immediately from his home. This obviously is the decision that plaintiffs question.

In *van Emrick*, a situation similar to ours, caseworkers determined that there was a possible child abuse situation, discussed it with superiors, obtained a court order and executed it. The Second Circuit determined that the caseworkers were entitled to qualified immunity and stated that "[t]he issue is not whether it was absolutely essential to remove the child or whether a more sensitive course would have been to leave the child hospitalized pending further investigation. The issue is whether it was objectively reasonable for the defendants to make the decision they made, and no rational jury could find that it was not." *van Emrick*, 911 F.2d at 866.

While in the situation at hand, defendant Laughman might have waited or pursued other investigative alternatives before making the decision to file for a temporary custody order, his actions cannot be viewed as objectively unreasonable under the circumstances. "It is precisely the function of qualified immunity to protect state officials in choosing between such alternatives, provided that there is an objectively reasonable basis for their decision whichever way they make it." *Id.; see also In re Scott County Master*

*Docket*, 672 F.Supp. at 1166–67, n. 2 ("[T]he Court will not blind itself to the fact that child protection workers are under pressure to act quickly to remove children from homes where abuse is suspected. Given this pressure, it would be anomalous indeed to hold that child protection workers who do not act quickly are subject to suit for damages."); *Myers*, 810 F.2d at 1463 ("Nor is there any legal precedent which suggests that acting upon a reasonable belief that children are endangered by their continued presence in their homes must be deferred until the completion of additional investigation."). We believe that the information that was presented to Laughman by the school was compelling, and it was thus objectively reasonable for him to believe that there existed a threat to Michael's safety that warranted the filing of an emergency custody petition.[25]

While we are certainly most sympathetic with plaintiffs and other parents in their position who feel that they have been wrongly accused of child abuse, we simply cannot ignore the confines of the law. Under the law, teachers must report, and child service agencies must investigate, all suspected allegations of child abuse. This reporting requirement is all the more compelling when the children at issue suffer from some form of mental disability. Not only may they have difficulty communicating, but they are in the highest risk category for child abuse. We certainly appreciate the difficulties child care

---

Pursuant to the provisions of section 6315 (relating to taking child into protective custody) and after court order, the child protective service shall take a child into protective custody for protection from further abuse. No child protective service worker may enter the home of any individual for this purpose without judicial authorization.

The text of 23 Pa.C.S.A. § 6315 reads in pertinent part:

§ 6315. **Taking a child into protective custody**

(a) **General rule.**—A child may be taken into protective custody:

(1) As provided by 42 Pa.C.S. § 6324 (relating to taking into custody).

\* \* \* \* \* \* \*

The text of 42 Pa.C.S. § 6324 reads in pertinent part:

§ 6324. **Taking into custody**

A child may be taken into custody:

(1) Pursuant to an order of the court under this chapter.

(2) Pursuant to the laws of arrest.

(3) By a law enforcement officer or duly authorized officer of the court if there are reasonable grounds to believe that the child is suffering from illness or injury or is in imminent danger from his surroundings, and that his removal is necessary.

\* \* \* \* \* \*

**25.** The information before Laughman was as follows:

a) Michael appeared at school in a highly agitated state and made allegations of sexual abuse by his father to two separate facilitators. He appeared to confirm these allegations, as best he could, through anatomically correct drawings.

b) Michael had previously alleged sexual abuse several times to both facilitators.

c) Michael's autism and mental retardation prevented him from significantly communicating or confirming his allegations in any other manner. *See* Affidavit of Rita Foster.

workers face today when investigating child abuse: "If they err in interrupting parental custody, they may be accused of infringing the parents' constitutional rights. If they err in not removing the child, they risk injury to the child." *Van Emrick*, 911 F.2d at 866. It is precisely this type of damned if you do, damned if you don't, discretionary decision-making on the part of government officials that the doctrine of qualified immunity doctrine was meant to protect.

### c. Defendant Stauffer

■ Plaintiffs allege against defendant Stauffer that he failed to "adequately monitor, supervise, and train defendants Lantz and Elledge in the provision of educational services and the use, validity, and reliability of 'facilitated communication'...." *See* Complaint at ¶ 35.

Defendant Stauffer was Michael's school year teacher at the time of the events in question. As far as we can ascertain, he engaged in no communication through FC with Michael on a regular basis, although he had been trained in its use along with other teachers at IU 13. After hearing of Lantz's suspicions of abuse in the fall of 1992, Stauffer apparently determined that not enough information existed at that point to report the child abuse allegations and directed that Elledge should be the primary facilitator with Michael when FC was used with him. Furthermore, Stauffer was present on February 9, 1993, when Michael facilitated his allegations again to both Lantz and Elledge, and we assume he participated in the decision to report the abuse although the person who made the actual report was Rita Foster.

We initially note that plaintiffs appear to allege a failure to train theory against defendant Stauffer that would fail on several grounds. First, aside from plaintiffs' statements in the complaint, there is no indication that Stauffer ever formally exercised any supervisory authority over defendants Lantz and Elledge since he himself was a teacher at IU 13. Second, since we previously found that it was objectively reasonable, at the time in question, for defendants to have relied on communications obtained through FC, the crux of plaintiffs' argument against Stauffer,

failure to train and supervise in the use of FC, is deflated. *See Sample v. Diecks*, 885 F.2d 1099, 1118 (3d Cir.1989) ("[A] person is not the 'moving force [behind] the constitutional violation' of a subordinate, unless that 'person' ... has exhibited a deliberate indifference to the plight of the person deprived.").

These arguments are tangential, however, since based on the above facts, we find that Stauffer's actions were objectively reasonable. Stauffer acted in accordance with the dictates of the Child Protective Services Law as described above. Furthermore, Stauffer did not report the allegations of abuse the first time he heard them in the fall of 1992 from Lantz, but waited until there was confirmation from another facilitator before reaching the conclusion that a report should be made.

### d. Defendant Landis

■ Plaintiffs allege against defendant Landis that he failed to "adequately monitor, supervise, and train defendant Laughman in the provision of child protective services and the investigation of allegations of sexual and physical abuse,...." *See* Complaint at ¶ 38. Landis initially spoke with Judge Cullen on the telephone regarding the allegations made by Michael and apparently participated in the decision to file for a custody petition with the court.

Based on the same reasoning we engaged in with regard to defendant Laughman above, we find that defendant Landis's actions with regard to this case were objectively reasonable.

### e. Defendants Sohonyay and Sherr

Plaintiffs also allege against defendants Sohonyay and Sherr a general theory of failure to "monitor, supervise, and train" defendants Laughman, Landis, Elledge, Lantz, and Stauffer. Defendant Sherr is the Executive Director of IU 13 and defendant Sohonyay is the Director of the Agency.

■ We note first that plaintiffs' complaint and subsequent pleadings are void of specific allegations against either of these defendants. Nowhere is it indicated that

either defendant personally participated in the events, and thus their only potential liability arises under a theory of *respondeat superior*. It is well established in § 1983 case law that a supervisor cannot be held liable merely on a theory of *respondeat superior*, but that a plaintiff must allege some affirmative conduct on the part of the supervisor. *See Rizzo v. Goode*, 423 U.S. 362, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976). A plaintiff may establish such conduct either through "allegations of personal direction or of actual knowledge and acquiescence" or through proof of direct discrimination by the supervisor. *See Keenan v. City of Philadelphia*, 983 F.2d 459 (3d Cir.1992); *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1478 (3d Cir. 1990) (citations omitted). Accordingly, since plaintiffs' have not alleged such involvement, we grant summary judgment in favor of defendants Sohonyay and Sherr.[26] *See Myers*, 810 F.2d at 1464–65 (no supervisory liability for sheriff when no clearly established law existed, deputies' actions were objectively reasonable, and there were no allegations of personal involvement).

## B. MUNICIPAL LIABILITY

Local governments may be held to answer for Constitutional violations caused by official policy or custom of the municipality. *See Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037–38, 56 L.Ed.2d 611 (1978). The Supreme Court defined such a municipal policy as a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers." *Id.* at 690, 98 S.Ct. at 2036. A municipal custom for § 1983 purposes is "such practices of state officials ... [as are] so permanent and well-settled as to constitute a 'custom or usage'

with the force of law." *Id.* at 691, 98 S.Ct. at 2036 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167–68, 90 S.Ct. 1598, 1613, 26 L.Ed.2d 142 (1970)); *see City of Oklahoma City v. Tuttle*, 471 U.S. 808, 820–24, 105 S.Ct. 2427, 2434–37, 85 L.Ed.2d 791 (1985) (policy must be "moving force" behind Constitutional violation)." Municipal entities are not entitled to the defense of qualified immunity. *See Owens v. City of Independence*, 445 U.S. 622, 100 S.Ct. 1398, 63 L.Ed.2d 673 (1980).

Plaintiffs allege against defendant IU 13 that since "defendants Lantz, Elledge, Stauffer, and Sherr were acting within the scope of their employment at, and according to the policies and procedures of, defendant IU 13, ... said acts were ratified by defendant IU 13. As a result, defendant IU 13 is liable for the acts of defendants Lantz, Elledge, Stauffer, and Sherr, as described in this complaint." *See* Complaint at ¶ 37. Plaintiffs similarly allege against defendant Agency that since "defendants Laughman, Landis, and Sohonyay were acting within the scope of their employment at, and according to the policies and procedures of, defendant CYA, and as such, said acts were ratified by defendant CYA. As a result, defendant CYA is liable for the acts of defendants Laughman, Landis, and Sohonyay, as described in the complaint." *See* Complaint at ¶ 40.

We first note that plaintiffs essentially allege a theory of *respondeat superior* liability against defendants IU 13 and Agency. However, a municipality cannot be held liable under this type of theory. *See Monell*, 436 U.S. at 694, 98 S.Ct. at 2037–38. Plaintiffs argue, however, in their response to defendants' Motions for Summary Judgment,

---

**26.** We note that Agency defendants have also raised the defense of absolute immunity. While we recognize that lower courts have often granted absolute immunity to social workers for their actions involving the initiation and prosecution of child custody proceedings, *see Meyer v. Contra Costa County Dept. of Social Service*, 812 F.2d 1154 (9th Cir.), *cert. denied*, 484 U.S. 829, 108 S.Ct. 98, 98 L.Ed.2d 59 (1987); *Fanning v. Montgomery County Children and Youth Service*, 702 F.Supp. 1184 (E.D.Pa.1988); *Mazor v. Shelton*, 637 F.Supp. 330 (N.D.Cal.1986); *Whelehan v. County of Monroe*, 558 F.Supp. 1093 (W.D.N.Y.

1983), we need not address the issue at this point since we have already granted defendants qualified immunity. We are mindful, however, of the warning of the Second Circuit in counseling against such an extension of absolute immunity:

> [W]e think the strong emotional response provoked in anyone hearing an allegation of child abuse counsels against according an official absolute immunity for a taking in the wake of any and every such allegation, lest the official power itself become more likely to be abused. *Robison*, 821 F.2d at 920.

that the decision to use FC was indeed one of policy:

> ... the reliance upon that which was obtained through Facilitated Communication in pursuing this matter originally was not a decision left to the individual employees of the Agency. In other words, reliance upon Facilitated Communications by the Agency and the apparent failure to consider the complete absence of any other evidence which would corroborate the contents of the Facilitated Communications is a direct result of the execution of a governmental policy, regulation, or officially adopted decision.

*See* Plaintiff's Response to Summary Judgment at 4.

■ We find that since we held individual defendants actions vis-a-vis use of FC to be objectively reasonable, and thus entitled to qualified immunity, there can be no basis of recovery against the municipal agencies. *See City of Los Angeles v. Heller,* 475 U.S. 796, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986) (per curiam) (holding that a municipal entity cannot be held liable for failing to train or supervise an officer where there is no underlying Constitutional violation by the officer); *Frazier,* 957 F.2d at 931 (no basis of recovery in civil rights action against agencies investigating allegations of child abuse, where only possible liability of agencies would derive from the culpability of their respective employees, and those employees were entitled to defense of qualified immunity); *Williams v. Borough of West Chester,* 891 F.2d 458 (3d Cir.1989) (where a plaintiff's claims focus on harm caused by the actions of municipal employees, rather than harm directly traceable to a municipal policy, municipal liability claims must be dismissed where the individual officer is exonerated). *Cf. Fagan v. City of Vineland,* 22 F.3d 1283 (3d Cir.1994) (municipality may be held independently liable

even if no individual liability found if claims "based on different theories and require proof of different actions and mental states ...").

■ Even if we had not so found, however, defendants Agency and School would nevertheless be entitled to dismissal of the claims against them. This is because, beyond the allegations quoted above, plaintiffs offer no support for their contention that the use of information received through FC was the result of a "policy" or "custom" on the part of the municipal defendants. Generally, proof of a single incident of unconstitutional activity is insufficient to impose municipal liability unless there is proof that it was caused by an existing municipal policy attributable to municipal policy-makers. *See City of Oklahoma City,* 471 U.S. at 823–24, 105 S.Ct. at 2436–37; *Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986) (municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances); *see also Reynolds By Reynolds v. Strunk,* 688 F.Supp. 950 (S.D.N.Y. 1988) (county social service agency not liable under § 1983 absent allegation that its actions were the product of official government policy); *Millspaugh,* 746 F.Supp. at 848 (social service department not liable under § 1983 because plaintiffs failed to demonstrate any causal connection between the department's policies and the alleged deprivations). Consequently, we dismiss all claims against defendants IU 13 and Agency.[27]

## IV. PENDENT STATE LAW CLAIMS

Since we have dismissed all of plaintiffs' federal claims against defendants, the determination of whether to entertain or dismiss the pendent state claims is within our discretion.[28] The Supreme Court has indicated,

---

27. We note that IU 13 has also raised the defense of immunity pursuant to the 11th Amendment to the Constitution, alleging that it is a "state agency." The 11th Amendment generally divests federal courts of jurisdiction to entertain suits directly against states. *See Edelman v. Jordan,* 415 U.S. 651, 662–63, 94 S.Ct. 1347, 1355–56, 39 L.Ed.2d 662 (1974). The court must examine the essential nature of an entity to determine whether it is a "state agency" under state law.

*See Mt. Healthy City Bd. of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572–73, 50 L.Ed.2d 471 (1977). Since defendants do not support their defense with any evidence or case law, we will treat this defense as merely hortatory and decline to address it at this time.

28. 28 U.S.C. § 1367 codified the common law abstention doctrines and reads in relevant part: (c) The district courts may decline to exercise

however, that "if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United States Mineworkers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966); *See Robison*, 821 F.2d at 925 ("When the federal claim must be dismissed, it may be an abuse of discretion to take pendent jurisdiction of a claim that depends on novel questions of state law."). Accordingly, since we have dismissed all federal claims against all defendants in this action, we exercise our discretion to dismiss the pendent state claims.[29]

## V. CONCLUSION

For the reasons outlined in the foregoing memorandum, we grant summary judgment in favor of all defendants. An appropriate order follows.

supplemental jurisdiction over a claim under subsection (a) if ... (3) the district court has dismissed all claims over which it has original jurisdiction.

29. This dismissal is without prejudice to plaintiffs' rights to present their claims in state court, although we note some doubt as to the validity of those claims. *See* footnote 11, *supra*.