Oscar W. **EGERVARY**

v.

Frederick P. **ROONEY**, Esq., et al.

No. CIV. A. 96–3039.

United States District Court,
E.D. Pennsylvania.

Jan. 21, 2000.

Gary L. Azorsky, Mesirov, Gelman, Jaffe, Cramer & Jamieson, LLP, Philadelphia, PA, for Plaintiff.

Richard A. Kraemer, Marshall, Dennehey, Warner, Coleman & Goggin, Philadelphia, PA, for Frederick P. Rooney, James J. Burke, Defendants.

Frederick C. Horn, Robert S. Tintner, Fox, Rothschild, O'Brien & Frankel, LLP, Philadelphia, PA, for Jeffrey C. Nallin, Defendant.

### *MEMORANDUM*

O'NEILL, District Judge.

### I. INTRODUCTION

Defendants' motion for summary judgment raises questions of first impression involving the Hague Convention on the Civil Aspects of International Child Abduction and the International Child Abduction Remedies Act ("ICARA"). The Court must decide whether removing an allegedly-kidnaped child from his father's custody and returning the child to his mother in a foreign country without notice and oppor-

tunity to be heard gives rise to a due process claim under *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). If so, the Court must decide whether the claim survives various defenses, including waiver and immunity. For the reasons stated below, defendants' motion for summary judgment will be DENIED and defendants will be ORDERED to submit further briefing as to whether summary judgment should be entered against them on the question of liability.

## II. BACKGROUND

### A. Mr. Egervary's Marriage to Ms. Kovacs and Oscar's Alleged Abduction [1]

Oscar Egervary ("plaintiff" or "Mr. Egervary") was born in 1955 in Hungary, where he suffered political oppression at the hands of the then-communist government because his father was a church official. *See* Egervary Aff. ¶¶ 1–2. In 1980, he emigrated to the United States as a political refugee. *Id.* He became a citizen of the United States in 1987. *Id.* ¶ 3.

In 1990, Mr. Egervary became romantically involved with Aniko Kovacs ("Ms. Kovacs"), a Hungarian national who came to the United States to study music. *Id.* ¶ 4. They briefly returned to Hungary in 1991 to be wed by Mr. Egervary's father. *Id.* Thereafter, they established their martial residence in Hackensack, New Jersey. *Id.* ¶ 5. Their son, Oscar Jonathan Egervary ("Oscar"), was born on Independence Day, July 4, 1992. *Id.* ¶ 6.

In February 1993, Ms. Kovacs, a concert violinist, traveled to Hungary with Oscar to perform in a concert to be held in Budapest that March. *Id.* ¶ 7. They were scheduled to return to the United States on April 6, 1993, and Mr. Egervary had purchased a ticket to fly to Hungary and

escort them back to the United States. Egervary Supplemental Aff. ¶ 2. A few days before, however, Ms. Kovacs called Mr. Egervary and said she needed to stay until the beginning of May to perform in another concert. *Id.* Once again, shortly before she and Oscar were to return in May, Ms. Kovacs called Mr. Egervary and said that she would be staying in Hungary because she had an opportunity to take a teaching position in Budapest until the end of the year. *Id.* Shortly thereafter, she informed Mr. Egervary that she would not return to the United States and would not return Oscar to this country. *Id.*

In June and July of that year, Mr. Egervary traveled to Hungary in an attempt to reconcile with his wife and bring Oscar home. *Id.* In July, Ms. Kovacs returned to the United States with Mr. Egervary for a short time, but she insisted on leaving Oscar in Hungary with her parents. *Id.*

In August, Mr. Egervary returned to Hungary and stayed there for three months in an another attempt to reconcile with his wife. *Id.* During that stay, Mr. Egervary took a job teaching English in order to support himself. *Id.* He worked there from approximately August to November of 1993. *Id.* He moved some of his personal belongings from the United States, but he did not plan on establishing residence there and did not register with the Hungarian government as a resident. *Id.*

In September, Ms. Kovacs took Oscar to an undisclosed location within Hungary in an apparent attempt to hide the child from his father. Egervary Aff. ¶ 8. At that time, she left Mr. Egervary a letter that, in part, stated: "I'd like to notify you in this farewell letter that I've moved out from you, together with Ossika [Oscar] . . . I moved to a location unknown to others

---

1. The Court takes no position on whether plaintiff's removal of his son from Hungary was lawful under the Hague Convention or any other law. However, it is necessary to describe Mr. Egervary's version of these events in order to show the issues he could have raised in an ICARA hearing if he had been afforded notice and opportunity to be heard.

deliberately and I didn't move to my parents on purpose." Egervary Supplemental Aff. ¶ 3. Mr. Egervary searched for his son for approximately three months. *Id.* During that time, he consulted with the American Embassy in Budapest and was told that if he could find Oscar he was free to take him back to the United States. *Id.*

On December 18, 1993, Mr. Egervary found Ms. Kovacs and Oscar leaving her parents' apartment house in Budapest. *Id.* According to Mr. Egervary, Oscar's clothing was "dirty and ragged" and he appeared undernourished. Egervary Aff. ¶ 9. Mr. Egervary took Oscar from Ms. Kovacs and left Hungary with him the next day. *Id.* Upon their return to the United States, Mr. Egervary and Oscar set up residence in Monroe County, Pennsylvania. *Id.*

On May 13, 1994, members of the Pennsylvania State Police and the U.S. Marshals arrived at Mr. Egervary's home with an Order signed by the Honorable William J. Nealon of the United States District Court for the Middle District of Pennsylvania. *Id.* ¶ 10. Pursuant to the Order, Oscar was forcibly removed from Mr. Egervary's custody and delivered to defendant Frederick P. Rooney, Esq. *See* Complaint ¶ 15; Mem. of Defendants Frederick P. Rooney, Esq. and James C. Burke, Esq. at 6 ("Rooney Mem."); Mem. of Defendant Jeffrey C. Nallin, Esq. at 3 ("Nallin Mem."). Defendant Rooney then took Oscar to the airport, flew him to Europe and delivered him to Ms. Kovacs. *Id.* All parties concede that Mr. Egervary had no notice or opportunity to be heard in the proceedings that led to the May 13th Order.

### B. The Hague Convention/ICARA Proceedings

The Hague Convention is a multilateral international treaty on parental kidnaping adopted by the United States and other nations in 1980. The goal of the Convention is to "protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence." *See* Hague Convention, Preamble. The Convention reflects "a universal concern about the harm done to children by parental kidnaping and a strong desire among the Contracting States to implement an effective deterrent to such behavior." *Feder v. Evans-Feder,* 63 F.3d 217, 221 (3d Cir. 1995). The Convention is "designed to restore the 'factual' status quo which is unilaterally altered when a parent abducts a child." *Id.* The Hague Convention has been implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 et seq. ICARA vests state and district courts with concurrent jurisdiction over claims arising under the Convention and empowers those courts to order the return of kidnaped children. *See* 42 U.S.C. § 11603. An ICARA hearing is not a custody hearing. *See Blondin v. Dubois,* 189 F.3d 240, 243 (2d Cir.1999) (under ICARA, a district court has "the authority to determine the merits of an abduction claim, but not the merits of the underlying custody claim"), quoting *Friedrich v. Friedrich,* 983 F.2d 1396, 1400 (6th Cir. 1993); Hague Convention, Article 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue."). Rather, an ICARA proceeding merely determines which nation should hear the underlying custody claim. *Blondin,* 189 F.3d at 246.

An ICARA petitioner bears the burden of proving by a preponderance of the evidence that the child in question has been wrongfully removed (or retained) from the nation of his or her "habitual residence" immediately before the removal. *See* 42 U.S.C. § 11603(e)(1)(A); Hague Convention, Articles 3 and 4. If the petitioner establishes that the removal was wrongful, the child must be returned unless the respondent can establish one of four different defenses: 1) the ICARA proceedings were not commenced within one year of

the child's abduction; 2) the petitioner was not actually exercising custody rights at the time of the removal; 3) there is a grave risk that return would expose the child to "physical or psychological harm or otherwise place the child in an intolerable situation"; or 4) return of the child "would not be permitted by the fundamental principles ... relating to the protection of human rights and fundamental freedoms." *Id.;* Hague Convention, Articles 12, 13 and 20. The first two defenses can be established by a preponderance of the evidence; the last two must be established by clear and convincing evidence. *Id.;* 42 U.S.C. § 11603(e)(2).

ICARA also provides that notice "be given in accordance with the applicable law governing notice in interstate child custody proceedings." 42 U.S.C. § 11603(c). However, because there is an inherent risk of flight during the pendency of a petition, courts "may take or cause to be taken measures under Federal or State law, as appropriate, to protect the well-being of the child involved or to prevent the child's further removal or concealment *before the final disposition of the petition." See* 42 U.S.C. § 11604(a) (emphasis added).

Sometime after Oscar was taken from his custody, Mr. Egervary learned that on that same day defendants (all attorneys) had filed an ICARA petition on behalf of his estranged wife. The petition alleged that Mr. Egervary's removal of Oscar from Hungary in December 1993 was a "wrongful removal" within the meaning of the Convention. *See* ICARA Petition of Aniko Kovacs dated May 13, 1994 at 2. It further requested that Oscar be "returned to the Petitioner [Ms. Kovacs] or to Petitioner's agent, Federick P. Rooney, Esquire, who will temporarily care for the child until the child is turned over, through agent, Frederick P. Rooney, Esquire, to the custody of the Petitioner." *Id.* at 3. However, the events surrounding consideration of the petition are in dispute.[2]

According to the defendants, they presented Judge Nealon with "several alternatives, including holding a hearing." Rooney Mem. at 6. Defendants further claim that Judge Nealon chose to forego a hearing and ordered the immediate seizure and return of Oscar to Ms. Kovacs because Judge Nealon feared Mr. Egervary would go into hiding if he had notice. *Id.*

Plaintiff, on the other hand, claims that defendant Rooney told Judge Nealon that the defendants "represented the State Department, that no notice to Mr. Egervary was required, that the State Department 'does this all the time,' and that all arrangements had been made to take plaintiff's son to Hungary that afternoon as soon as Judge Nealon sign[ed] the order permitting them to move forward."[3] Plaintiff's Mem. at 11.

**2.** Ordinarily, in considering a motion for summary judgment, the Court views the facts in the light most favorable to the nonmoving party (here, plaintiff). However, because of a discovery dispute, the parties have submitted no evidence upon which the Court could establish the facts surrounding the *ex parte* ICARA proceedings for the purposes of this motion. If the Court needed to establish those facts in order to rule on the motion, it would grant plaintiff's motion in the alternative under Fed.R.Civ.P. 56(f) and provide time for the necessary depositions to be taken. However, since defendants' motion goes to the sufficiency of plaintiff's claim as a matter or law, it can be considered without further delay. Nonetheless, for the purposes of this factual narrative, the Court will relate the representations of both sides as to what the evidence is likely to show occurred in those *ex parte* proceedings.

**3.** The basis for this claim appears in the Affidavit of Gary L. Azorsky, Esq., plaintiff's counsel: "At a case management conference in this action before The Honorable William J. Nealon, Jr. on December 11, 1997, defendants' counsel presented Judge Nealon with the same factual allegations that are now [summarized in the main text above]. Judge Nealon advised counsel that his recollection significantly differed from defendants' stated position. His Honor stated that it was not true that defendants presented him with several options from which to choose, and that he decided upon one option following careful review and consideration of all options. His Honor advised that it was his recollection that

Regardless of which version is accurate, the petition was granted, and Oscar was returned to Hungary that same day without any notice or opportunity to be heard having been afforded to Mr. Egervary.

### C. The Motion for Reconsideration

On May 27, 1994, Mr. Egervary filed a motion for reconsideration of the May 13th Order. *See* Docket for *In re Oscar Jonathan Egervary,* No. 94–707, M.D. Pa.1994. Oral arguments on the motion were heard on July 25, 1994. *Id.* By December, the motion had been fully briefed, but had not been decided.

On December 19, 1994, plaintiff's counsel responded to an inquiry regarding the status of the motion and the then-pending custody proceedings in Hungary. *See* Letter from Gary L. Azorsky, Esq. to Judge Nealon dated December 19, 1994 at 1. Plaintiff's counsel first acknowledged that the custody proceedings might moot the motion for reconsideration. *Id.* Plaintiff's counsel then presented Judge Nealon with two options:

> I recommend, and respectfully request, that Your Honor place this action in the civil suspense docket until such time as the parties can better ascertain whether the Hungarian action is likely to be resolved in a timely fashion. If the Hungarian action continues to drag on without a discernable endpoint after several months, then I will contact Your Honor and request that this matter be returned to the active docket so that we may proceed with a hearing.
>
> In the alternative, since the issues regarding the propriety of Mrs. Kovacs' initial petition have now been fully briefed, I dutifully and respectfully invite Your Honor to grant Mr. Eger-

vary's motion for reconsideration and order the immediate return of his child. *Id.* at 2.

In response to that letter, Judge Nealon entered the following Order a few days later:

> ORDER by Judge William J. Nealon; the Court having been previously advised that the above action cannot proceed to trial and disposition because of the following reason: Matter pending resolution in Hungarian courts; IT IS ORDERED that the Clerk of Court mark this action closed for statistical purposes; and IT IS FURTHER ORDERED that the Court shall retain jurisdiction; and that the case be restored to the trial docket when the action is in a status so that it may proceed to final disposition; *this Order shall not prejudice the rights of the parties to this litigation.*

*See* Order by Judge Nealon dated December 23, 1994 (emphasis added).

After a lengthy custody dispute, the Hungarian court awarded custody of Oscar to Ms. Kovacs in April 1996. *See* Deposition Tr. of Oscar Egervary dated March 11, 1999 at 18–19 ("Egervary Dep.").

### D. Procedural History of this Case

After the Hungarian court awarded custody to Ms. Kovacs, plaintiff filed this action in the Eastern District of Pennsylvania (the "Eastern District") on April 17, 1996 and the case was assigned to the Honorable E. Mac Troutman. The complaint named Frederick P. Rooney, Esq., James C. Burke, Esq. and Jeffrey C. Nallin, Esq., the three attorneys who represented Ms. Kovacs in the ICARA hearing before Judge Nealon, as well as two officials of the U.S. State Department. Count I one of the complaint alleges that defen-

---

Mr. Rooney stated that he represented the State Department, that no notice to Mr. Egervary was required, that the State Department 'does this all the time,' and that all arrangements had been made to take plaintiff's son to Hungary that afternoon as soon as His Honor

signs [sic] the order permitting them to move forward." Aff. of Gary L. Azorsky, Esq. ¶ 10–11. Mr. Azorsky also states that Judge Nealon agreed to make himself available for deposition to recount these events, if necessary. *Id.* ¶ 11.

dants violated plaintiff's due process rights under the Fifth Amendment.[4] Count II alleges that defendants conspired to violate those rights.[5]

On February 4, 1997, Judge Troutman transferred the case to the Middle District of Pennsylvania (the "Middle District") pursuant to 28 U.S.C. § 1406, finding that venue was improper in this district.[6] There the case was assigned to Judge Nealon, who later recused himself when it became clear that he might be a witness in these proceedings. After the remaining judges in the Middle District also recused themselves, the Honorable Sue L. Robinson of the U.S. District Court for the District of Delaware was designated to preside over the case in the Middle District. On August 17, 1998, Judge Robinson granted summary judgment in favor of the State Department defendants. Thereafter, upon unopposed motion by plaintiff, Judge Robinson transferred the case back to the Eastern District pursuant to 28 U.S.C. § 1404.

## III. DISCUSSION

### A. Standard for Summary Judgment

Rule 56 empowers a court to enter summary judgment if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law." *See* Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* at 249, 106 S.Ct. 2505. In considering a motion for summary judgment, "all inferences to be drawn from the evidence ... must be viewed in the light most favorable to the party opposing the motion." *Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989).

### B. *Bivens* Claim

The Due Process Clause of the Fifth Amendment states that no person shall "be deprived of life, liberty, or property without due process of law." U.S. Const. amend. V. "Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Mullane v. Central Hanover Bank & Tr. Co.,* 339 U.S. 306, 313, 70 S.Ct. 652, 94 L.Ed. 865 (1950). Moreover, neither of these "fundamental requisite[s]" of due process is satisfied by mere pretense. *Id.* at 314, 70 S.Ct. 652. Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action." *Id.* Similarly, the opportunity to be heard "must be granted at a meaningful time and in a meaningful manner." *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965).

In *Bivens v. Six Unknown Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971),

4. Plaintiff challenges the constitutionality of the Hague Convention and ICARA as applied in these circumstances. This decision should not be read to imply any view on the facial validity of those laws.

5. The complaint does not state whether the conspiracy count arises under state or federal law, and defendants have not challenged the jurisdictional basis for that claim. The Court finds that even if the conspiracy count is a state law claim jurisdiction is proper under 28 U.S.C. § 1367. Federal courts have traditionally avoided deciding issues involving family law. *See generally Solomon v. Solo-*

*mon,* 516 F.2d 1018, 1024–25 (3d Cir.1975) (discussing the domestic relations exception to federal subject matter jurisdiction). However, the domestic relations exception does not apply to due process claims arising out of custody disputes. *See Weller v. Dep't. of Soc. Servs.,* 901 F.2d 387, 396 (4th Cir.1990).

6. Plaintiff and the three attorney defendants were residents of the Eastern District; the State Department defendants were not, and the events complained of occurred in the Middle District.

the Supreme Court recognized a tort cause of action against "federal agents" acting "under color of authority" for damages that arise because of the agent's "unconstitutional conduct." *See also Butz v. Economou,* 438 U.S. 478, 504, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978) ("[T]he decision in *Bivens* established that a citizen suffering a compensable injury to a constitutionally protected interest could invoke the general federal-question jurisdiction of the district courts to obtain an award of monetary damages against the responsible federal official."). *Bivens* actions are analogous to suits under 42 U.S.C. § 1983 against state officials who violate federal constitutional or statutory rights. Although the two bodies of law are not "precisely parallel," there is a "general trend" to incorporate Section 1983 law into *Bivens* suits. *See Chin v. Bowen,* 833 F.2d 21, 24 (2d Cir. 1987), quoting *Ellis v. Blum,* 643 F.2d 68, 84 (2d Cir.1981).

■ Attorneys who assist in executing a federal court order are federal agents acting under the color of authority and can be held liable in a *Bivens* suit. *See Vector Research, Inc. v. Howard & Howard Attorneys P.C.,* 76 F.3d 692 (6th Cir.1996) (holding that attorneys who obtained an *ex parte* court order authorizing a search pursuant to the Copyright Act and assisted U.S. Marshals in the search could be held liable as federal agents acting under the color of authority in a *Bivens* suit). Moreover, defendants have conceded for the purposes of this motion that they were federal agents acting under the color of authority. *See* Nallin Mem. at 9. Therefore, the Court need only decide whether defendants violated plaintiff's due process rights and whether plaintiff's claim survives defendants' defenses.

■ Procedural due process questions are examined in two steps. *See Kentucky Dep't. of Corrections v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). The first step "asks whether there exists a liberty interest which has been interfered with by the State." *Id.* If there is such an interest, the second step asks "whether the procedures attendant upon that deprivation were constitutionally sufficient." *Id.* The Court concludes that plaintiff had a liberty interest in the custody of his son and on the present record it is clear that defendants unconstitutionally infringed on that liberty interest by seizing plaintiff's son and returning him to Hungary without notice or opportunity to be heard.

1. Liberty Interest

■ It is well established that parents have a fundamental liberty interest in the custody of their children. *See Hollingsworth v. Hill,* 110 F.3d 733, 739 (10th Cir.1997) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, the mother had "a constitutionally protected liberty interest [in the custody of her children] which could not be deprived without due process"); *Jordan v. Jackson,* 15 F.3d 333, 342 (4th Cir.1994) (in a Section 1983 suit brought by parents whose son was removed from their custody without prior notice, court found that there "are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate"); *Weller v. Dep't. of Soc. Servs.,* 901 F.2d 387, 391 (4th Cir.1990) (in a Section 1983 suit brought by a father whose children were removed from his custody without prior notice, the father "clearly [had] a protectible liberty interest in the care and custody of his children"); *Robison v. Via,* 821 F.2d 913, 921 (2d Cir.1987) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, "it was clearly established that a parent's interest in the custody of his or her children was a constitutionally protected interest of which he or she could not be deprived without due process"); *Hooks v. Hooks,* 771 F.2d 935, 941 (6th Cir.1985) (in a Section 1983 suit brought by a mother whose

children were removed from her custody without prior notice, court found that it is "well-settled that parents have a liberty interest in the custody of their children"); *Lossman v. Pekarske,* 707 F.2d 288, 290 (7th Cir.1983) (in a Section 1983 suit brought by a father whose children were removed from his custody without prior notice, the father "unquestionably" had a liberty interest in the custody of his children); *Duchesne v. Sugarman,* 566 F.2d 817, 825 (2d Cir.1977) (in a Section 1983 suit brought by a mother whose children were removed from her custody without prior notice, court found a liberty interest in "the most essential and basic aspect of familial privacy, the right of the family to stay together without the coercive interference of the awesome power of the state").

■ Moreover, it is clear that plaintiff had a fundamental liberty interest in the custody of his son despite the fact that his estranged wife contested legal custody. Courts have recognized a parent's liberty interest in the custody of a child even when the parent only has physical, as opposed to legal, custody. For example, in *Farina v. City of Tampa,* 874 F.Supp. 383 (M.D.Fla.1994), prospective adoptive parents sued the city police after officers returned the child to his biological parents without any prior notice or judicial proceedings. Defendants conceded the underlying facts and acknowledged that the operative law provided for notice and opportunity to be heard before custody decisions are made. Defendants argued, however, that plaintiffs had no protected liberty interest because they had only physical, not legal, custody of the child. The court flatly rejected that distinction and found "no authority in support of [defendants'] distinction between physical and legal custody for procedural due process purposes." *Id.* at 386. On this basis, the court granted partial summary judgment in favor of the plaintiffs. *Id.* at 387.

Plaintiff therefore had a fundamental liberty interest in—at the very least—the continued physical custody of his son.

2. Constitutionality of the Process

■ Since plaintiff had a liberty interest in the custody of his son, the Court must next decide whether the procedure whereby that liberty interest was infringed upon in this case satisfied due process. The Court concludes that it did not.

a. Procedural Rights Under ICARA

The starting point for this inquiry is ICARA, which provides that notice "shall be given in accordance with the applicable law governing notice in interstate child custody proceedings." 42 U.S.C. § 11603(c). Courts interpreting this provision have found the "applicable law" to be the Parental Kidnaping Prevention Act, 28 U.S.C. § 1738A ("PKPA"), and the Uniform Child Custody Jurisdiction Act, 23 Pa.C.S.A. § 5341, et seq. ("UCCJA"). *See Brooke v. Willis,* 907 F.Supp. 57, 60 (S.D.N.Y.1995); *Klam v. Klam,* 797 F.Supp. 202, 205 (E.D.N.Y.1992). Both the PKPA and UCCJA provide for "reasonable notice and opportunity to be heard." *See* 28 U.S.C. § 1738A(e); 23 Pa. C.S.A. § 5345. This generally means "a plenary hearing at which both sides are heard." *Klam,* 797 F.Supp. at 205.

*Klam* is instructive. In *Klam,* a German father alleged that his ex-wife was unlawfully retaining their children in New York and that the children should be returned to Germany pursuant to the Hague Convention and ICARA. To that end, he filed an ICARA petition and warrant in lieu of a writ of habeas corpus asking that his children be taken into custody before the mother was notified of the ICARA proceedings. *Id.* at 203. In support of this request, the petition made a series of conclusory assertions, including the claim that the children were being "wrongfully detained" from the nation of their "habitual residence" and that the children would be "carried out of the jurisdiction" and

"suffer irreparable injury" unless the petition was granted. *Id.* at 204. The court was confronted with the issue of whether the petition could be granted *ex parte* based purely on the assertions contained in the petition. *Id.* at 206.

The court concluded that *ex parte* relief would violate the procedural protections of ICARA and gave two rationales for this conclusion. First, the court applied by analogy a series of cases holding that *ex parte* relief is inappropriate under the PKPA and UCCJA, absent "a showing of extraordinary circumstances." *Id.* Second, the court was hesitant to rely on the unsubstantiated allegations contained in the petition. *Id.* The Court therefore denied the *ex parte* request for interim relief, but stated that it would allow the father to proceed once the mother had been properly served. *Id.* at 207 n. 5.

The petition defendants submitted to Judge Nealon was remarkably similar to the petition rejected by the court in *Klam.* For example, the petition alleged that Mr. Egervary's removal of Oscar from Hungary in December 1993 was a "wrongful removal" from the child's "habitual residence" within the meaning of the Hague Convention and ICARA. *See* ICARA Petition of Aniko Kovacs dated May 13, 1994 ¶¶ 2, 5 and 6. The petition also asked for a warrant in lieu of habeas corpus based upon the allegation that Mr. Egervary would "upon being informed of these proceedings ... further abduct and secrete the child." *Id.* ¶ 12. However, defendants' petition also went a significant step further than the *Klam* petition. Defendants asked that Oscar be immediately turned over to defendant Rooney and returned to Ms. Kovacs, rather than being held pending final resolution of the ICARA petition. *Id.* ¶ 13. The petition at issue in this case was, therefore, a more egregious violation of plaintiff's rights than the petition involved in *Klam.*

Defendants seek to moot the obvious conclusion that plaintiff's rights under ICARA were violated by arguing that Os-car would have been immediately returned to Ms. Kovacs even if a hearing had been held that day. *See, e.g.,* Nallin Mem. at 13–14. The Court cannot accept that conclusion. Mr. Egervary had compelling, though not necessarily dispositive, arguments that could have been presented if he had been afforded notice and opportunity to be heard.

First, Mr. Egervary maintains that Ms. Kovacs took Oscar out of this country under false pretenses and then refused to return him. *See generally* Egervary Supplemental Aff. ¶ 2. If these allegations are true, then Ms. Kovacs likely violated the Hague Convention by unlawfully retaining Oscar outside of the country of his habitual residence.

Second, Mr. Egervary could have argued that the Hague Convention did not apply to Ms. Kovacs' claim because Hungary was not Oscar's habitual residence. Under ICARA, Ms. Kovacs had the burden of proving by a preponderance of evidence that Hungary was Oscar's habitual residence. *See* 42 U.S.C. § 11602(e). In *Feder v. Evans–Feder,* 63 F.3d 217, 224 (3d Cir.1995), the Court of Appeals defined "habitual residence" as "the place where [the child] has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective." The "shared intentions" of both the parents are relevant to this inquiry. *Id.* The *Feder* Court also specifically criticized a district court decision that found Germany was a child's habitual residence after "what began as a voluntary visit" to that nation turned into a "coerced residence." *Id.* at 224–25, discussing *In re Application of Ponath,* 829 F.Supp. 363 (D.Utah 1993). Consistent with *Feder,* Mr. Egervary could have argued that Oscar never experienced a degree of settled purpose in Hungary because he lived there for such a short time and was frequently moved around the country because of his mother's attempt to hide the child from his father. In addition, Oscar's parents never had a shared inten-

tion of residing in Hungary. Oscar was in Hungary only because his mother took him there, and she may have taken him there under false pretenses. Also relevant to this inquiry is the fact that Oscar is a United States citizen and at that point had spent the overwhelming majority of his life here.

Finally, even if the court rejected these arguments, Mr. Egervary would have had the opportunity to prove by clear and convincing evidence that Oscar's return would expose the child to "physical or psychological harm or otherwise place the child in an intolerable situation." *See* 42 U.S.C. § 11603(e)(2)(A); Hague Convention, Article 13. Specifically, Mr. Egervary could have developed the evidence that when he found his son in Hungary in December 1993 the boy "appeared undernourished" and wore "dirty and ragged" clothing. *See* Egervary Aff. ¶ 9.

The Court makes no finding as to whether Mr. Egervary would have prevailed on any of these arguments. Such a finding would not be possible without a full evidentiary hearing and is likely irrelevant to this case. It is nonetheless clear that plaintiff was deprived of any opportunity to present these arguments. The Court recognizes, however, that the mere fact that defendants violated plaintiff's statutory rights does not necessarily prove that they also violated his constitutional rights. *Cf. Robison*, 821 F.2d at 923 ("Federal constitutional standards rather than state standards define the requirements of procedural due process."). Therefore, the Court must also consider the due process requirements that apply in ordinary, i.e., non-Hague Convention, custody disputes.

b. Prior Process

Obviously, plaintiff's due process rights would not have been violated if he had received notice and opportunity to be heard prior to Oscar's removal from his custody. However, "due process is flexible and calls for such procedural protections as the particular situations demands."

*Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). For this reason, courts have found that even though parents have a fundamental liberty interest in the custody of their children they do not always have a right to prior process when the state removes their children from their custody.

Courts agree that "in emergency circumstances which pose an immediate threat to the safety of a child, officials may temporarily deprive a parent of custody without parental consent or a court order." *Hollingsworth*, 110 F.3d at 739. *See also Jordan*, 15 F.3d at 343 (parents can be deprived of custody of their child without prior process "where emergency action is necessary to avert imminent harm to a child."); *Weller*, 901 F.2d at 393 ("Due process does not mandate a prior hearing where emergency action may be needed to protect a child."); *Doe v. Hennepin County*, 858 F.2d 1325, 1329 (8th Cir.1988) (the state may intervene on behalf of "abused children" without prior notice); *Robison*, 821 F.2d at 921 ("officials may temporarily deprive a parent of custody in 'emergency' circumstances"); *Lossman*, 707 F.2d at 291 ("When a child's safety is threatened, that is justification enough for action first and hearing afterwards."); *Duchesne*, 566 F.2d at 826 (child can be removed without prior process in "extraordinary situations").

It is unclear whether the facts in this case justified Oscar's removal without prior process. In all the cases cited above where an emergency removal was found to be justified, there was specific evidence of an imminent threat of severe neglect or physical abuse. *See Jordan*, 15 F.3d at 336 (neglect); *Weller*, 901 F.2d at 391 n. 7 (physical abuse); *Doe*, 858 F.2d at 1326 (sexual abuse); *Robison*, 821 F.2d at 916 (sexual abuse); *Lossman*, 707 F.2d at 289 (physical abuse and death threats); *Duchesne*, 566 F.2d at 822 (neglect). By contrast, in *Hollingsworth*, where there were merely general allegations of "abuse, injury, molestation, and harassment" but no

concrete evidence of an "immediate threat," the removal without prior process was found to be unjustified. *Hollingsworth*, 110 F.3d at 740.

In this case, plaintiff was accused of kidnaping his son. Parental kidnaping is a serious offense that inherently involves a risk of further flight, but it is unclear whether that allegation alone is serious enough to justify emergency action to remove a child from his parent's custody without prior process. Notably, the court in *Klam* found that the bare allegation of kidnaping and the inherent risk of flight that comes with it, without more, are insufficient to justify such emergency action. *Klam*, 797 F.Supp. at 207–07. The court hinted, however, that additional specific evidence of physical abuse or risk of flight might have justified emergency action. *Id.*

While it is likely that the *Klam* analysis applies here and plaintiff was entitled to prior process in these circumstances, the Court need not resolve the issue because plaintiff was denied a prompt, state-initiated postdeprivation hearing.

### c. Prompt, State–Initiated Postdeprivation Hearing

■ Even when an imminent threat of harm justifies removing a child from their parent's custody without prior process, there must be a prompt, state-initiated postdeprivation hearing to ratify the removal. *See Jordan*, 15 F.3d at 343 ("[T]he requirements of due process may be delayed where emergency action is necessary to avert imminent harm to a child, provided that post-deprivation process to ratify the emergency action is promptly accorded."); *Weller*, 901 F.2d at 396 ("[E]ven if it

is constitutionally permissible to temporarily deprive a parent of the custody of a child in an emergency, the state has the burden to initiate prompt judicial proceedings to ratify its emergency action."); *Doe*, 858 F.2d at 1329 ("[T]he state may intervene on behalf of abused children … if the state provides an adequate postdeprivation hearing."); *Lossman*, 707 F.2d at 291 ("[W]here the state has a procedure for a prompt, adversary postdeprivation hearing in a child custody matter and the hearing is held and establishes that the state officers acted prudently in removing the child from the parent's custody without a prior hearing, that finding extinguishes a claim that the failure to hold a predeprivation hearing was a denial of due process."); *Duchesne*, 566 F.2d at 826 ("[I]n those 'extraordinary situations' where deprivation of a protected interest is permitted without prior process, the constitutional requirements of notice and an opportunity to be heard are not eliminated, but merely postponed.").

Defendants point to two events that supposedly gave plaintiff an adequate opportunity to be heard after Oscar had been removed from his custody: the motion for reconsideration before Judge Nealon and the custody proceedings in Hungary. Neither of these proceedings satisfy due process because neither was state-initiated and neither was sufficiently prompt.[7]

The *Duchesne* Court explained why a postdeprivation custody hearing must be initiated by the state:

> In this situation, the state cannot constitutionally "sit back and wait" for the parent to institute judicial proceedings. It cannot adopt for itself an attitude of "if you don't like it, sue." The burden of

---

**7.** Courts have recognized that it is virtually impossible for a parent to receive an adequate postdeprivation hearing once the child has been removed to another jurisdiction. *See Weller*, 901 F.2d at 396 (expressing "additional concern" because removal of the child from Maryland to Louisiana reduced the possibility of a prompt postdeprivation hearing); *Hooks*, 771 F.2d at 942–43 (noting that child's

removal to another jurisdiction "effectively eliminat[ed]" the possibility of an adequate postdeprivation hearing). The concern expressed in *Weller* and *Hooks* is even more serious where, as here, the child has been removed to a foreign country and any post-removal judicial action implicates complex issues of jurisdiction, comity and international law.

initiating judicial review must be shouldered by the government. We deal here with an uneven situation in which the government has a far greater familiarity with the legal procedures available for testing its action. In such a case, the state cannot be allowed to take action depriving individuals of a most basic and essential liberty interest which those uneducated and uninformed in legal intricacies may allow to go unchallenged for a long period of time.

*Duchesne*, 566 F.2d at 828 (internal cites and quotes omitted). *See also Weller*, 901 F.2d at 396. In this case, the motion for reconsideration was initiated by Mr. Egervary and the Hungarian custody proceedings were initiated by Ms. Kovacs.

Additionally, neither the motion for reconsideration nor the custody proceedings were sufficiently prompt to satisfy due process. Although there is no bright-line rule for deciding whether a postdeprivation custody hearing is sufficiently prompt, a survey of the case law shows that the delay should be measured in hours and days, not weeks and months.[8] *See Jordan*, 15 F.3d at 350–52 (approving of a state statute that provided for postdeprivation custody hearings "as soon as possible, but in no event later than seventy-two hours" after the child's removal); *Campbell v. Burt*, 949 F.Supp. 1461, 1468 (D.Haw.1996) (holding that a postdeprivation hearing one week after the state takes custody violates due process); *Lossman*, 707 F.2d at 290 (approving of a postdeprivation hearing that occurred eight days after the state took custody, but noting that the hearing had been scheduled to occur earlier, but the parent requested additional time for preparation); *Weller*, 901 F.2d at 396

(holding that a postdeprivation hearing four months after the state takes custody violates due process); *Duchesne*, 566 F.2d at 826 (holding that a postdeprivation hearing twenty-seven months after the state takes custody violates due process).

In this case, both of the alleged postdeprivation hearings happened well outside of the constitutionally permissible time frame. The motion for reconsideration was filed approximately two weeks after Oscar was returned to Hungary. *See* Docket for *In re Oscar Jonathan Egervary*, No. 94–707, M.D.Pa.1994. Oral arguments on that motion occurred more than two months later on July 25, 1994. *Id.* As of December, approximately seven months after Oscar was taken from Mr. Egervary's custody, the motion remained undecided and the case was "closed for statistical purposes." *See* Order by Judge Nealon dated December 23, 1994 (dismissing the case "for statistical purposes" and without prejudice in light of the Hungarian proceedings). Such a timetable is typical when federal courts deal with complex motions. Nonetheless, seven months is not sufficiently prompt for due process purposes.

The Hungarian custody proceedings were even less prompt. The record shows that Mr. Egervary had no notice of the Hungarian proceedings until approximately a month after Oscar was taken from his custody. *See* Egervary Dep. at 85. A hearing in the matter was later scheduled for January 1995. *See* Letter from Gary L. Azorsky, Esq. to Judge Nealon dated December 19, 1994 at 2. The Hungarian courts did not resolve the issue until a final divorce decree between Mr. Egervary and Ms. Kovacs was entered in April 1996,

---

8. In considering the promptness of postdeprivation custody hearings, courts have taken guidance from the Supreme Court's decisions in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), and *County of Riverside v. McLaughlin*, 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991). *See Jordan*, 15 F.3d at 349 (applying *Gerstein* and *McLaughlin* ); *Duchesne*, 566 F.2d at 828 n. 24 (applying *Gerstein* ). In *Gerstein*, the Court held that the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to any extended pretrial detention of an individual suspected of a crime. In *McLaughlin*, the Court applied *Gerstein* and found that such hearings must take place within 48 hours of the arrest, absent some "extraordinary circumstance." *McLaughlin*, 500 U.S. at 57, 111 S.Ct. 1661.

nearly two years after Oscar was returned to Hungary. *See* Egervary Dep. at 18–19.

Defendants rely on *Dincer v. Dincer*, 549 Pa. 309, 701 A.2d 210 (1997), in an attempt to show that plaintiff was afforded "full due process" in the Hungarian proceedings. *See* Nallin Mem. at 11. This reliance is misplaced. In *Dincer*, a mother brought her three children from Belgium to Montgomery County, Pennsylvania, ostensibly so that the children could visit their grandparents. Approximately two weeks after their arrival, the mother filed for custody of the children in Pennsylvania state court. Shortly thereafter, the father, who had remained in Belgium, filed for custody in the courts of that nation. The mother received notice of the Belgian proceedings, but failed to appear. The Belgian courts then awarded custody to the father. The mother nonetheless pressed the Pennsylvania court to award custody to her. The Pennsylvania court refused, finding that the Belgian custody order must be given comity because Belgium was the children's "home state" under the UCCJA. *Id.* at 321, 701 A.2d 210. In affirming the trial court, the Pennsylvania Supreme Court stated in dicta that the mother had been afforded due process in Belgium because she received notice and opportunity to be heard. *Id.*

The differences between this case and *Dincer* are obvious. In *Dincer* the state never took custody of the children; therefore, no postdeprivation hearing was possible or necessary. While the mother surely acted improperly by bringing the children here under false pretenses, as a private party her actions were beyond the reach of the Due Process Clause.[9] Moreover, the *Dincer* Court found that the mother had been afforded due process in the Belgian proceedings because she had received notice and opportunity to be heard. *Id.* It is undeniable that the plaintiff received neither in this case. *Dincer* therefore does

nothing to undermine the conclusion that plaintiff was denied a prompt, state-initiated and constitutionally adequate postdeprivation hearing in this case.

## C. Defenses

Although the previous analysis leads to the conclusion that defendants violated plaintiff's due process rights, defendants make four arguments against holding them liable in a *Bivens* suit. Defendants argue that: 1) plaintiff waived his constitutional claim by withdrawing the motion for reconsideration before Judge Nealon; 2) plaintiff suffered no compensable damages; 3) plaintiff impermissibly seeks to collaterally attack the May 13th Order; and 4) courts have been "reluctant" to impose liability upon individuals participating in the return of kidnaped children. None of these arguments is persuasive.

### 1. Waiver

Defendants first argue that plaintiff waived his constitutional claim because he "withdrew" his motion for reconsideration of the May 13th Order. *See* Rooney Mem. at 6; Nallin Mem. at 2. The Court rejects this argument because there is an issue of fact as to whether plaintiff withdrew the motion, and even if he did, as a matter of law the withdraw did not waive his constitutional claim.

### a. Waiver as an Issue of Fact

The starting point for defendants' waiver argument is the following factual claim:

> Although plaintiff filed a Motion for Reconsideration which was fully briefed, and ready for decision, plaintiff withdrew his motion and advised the Court he would prosecute his divorce and custody proceedings in Hungary. *Plaintiff never requested that Judge Nealon re-*

---

**9.** Her actions were also beyond the reach of ICARA because Belgium is not a signatory to the Hague Convention. *See Dincer v. Dincer*,

No. 94–24367, slip op. at 14–15 (Court of Common Pleas of Montgomery County, Pennsylvania April 15, 1998).

*consider, amend, vacate or in any way change his May 13, 1994 Order.*

Rooney Mem. at 6 (emphasis added).

Defendants cite three pieces of evidence in support of this factual claim, but all three undermine defendants' argument. *See* Nallin Mem. at 5–6. The first, the letter in which plaintiff allegedly withdrew the motion, ends with the following statement:

> [S]ince the issues regarding the propriety of Mrs. Kovacs' initial petition have now been fully briefed, *I dutifully and respectfully invite Your Honor to grant Mr. Egervary's motion for reconsideration and order the immediate return of his child;* in that event, the proper jurisdiction for ruling on the custody issue could be determined by the appropriate forum absent the unfair advantage obtained by Mrs. Kovacs through improper unilateral action.

*See* Letter from Gary L. Azorsky, Esq. to Judge Nealon dated December 19, 1994 at 2 (emphasis added). This passage directly contradicts defendants' claim that plaintiff "never requested that Judge Nealon reconsider, amend, vacate or in any way change his May 13, 1994 Order."

Defendants next cite the Order that Judge Nealon entered in response to that letter. *See* Nallin Mem. at 5. In that Order, Judge Nealon dismissed the case "for statistical purposes" and specifically stated that the dismissal "shall not prejudice the rights of the parties to this litigation." *See* Order by Judge Nealon dated December 23, 1994. The Order therefore does not support the contention that plaintiff withdrew or waived his constitutional claim; rather, it obviously protected plaintiff's right to pursue a later remedy depending upon the outcome of the Hungarian proceedings. The fact that plaintiff chose to vindicate those rights in a *Bivens* suit, rather than by renewing the motion for reconsideration, is of no importance here.

Finally, defendants selectively quote from plaintiff's deposition testimony in an apparent effort to show that plaintiff admitted he withdrew the motion for reconsideration. *See* Nallin Mem. at 5. However, read as a whole, plaintiff made no such admission:

Q: It is my understanding, correct me if I am wrong, that you withdrew your petition for reconsideration by Judge Nealon and told him that you were going to participate in the custody matter in the Hungarian Courts. Do you recall that?

A: No. That's not my understanding.

Q: What is your understanding?

A: That I, through my attorney, asked Judge Nealon to put that in pending, or not to continue with that for the moment since he refused to order the child back to the United States.

Q: Did you tell him that you were going to, through your attorney did you tell the court that you were going to litigate the issue of custody of the child in Hungary?

A: I don't recall that, whether we told him or not.

Q: Was that your intention at that time that you were going to litigate custody in Hungary?

A: Not really my intention, but I didn't see anything else to do. Had I didn't [sic] go there I felt that I might have a chance, that I have no way of getting any kind of custody of Oscar.

Q: Well, what was your intention when you discontinued the proceedings before Judge Nealon?

A: My understanding is that I didn't discontinue. We just put it on hold.

*See* Egervary Dep. at 21–22.

The only reasonable interpretation of these facts directly contradicts defendants' factual claim. Plaintiff did not withdraw his motion for reconsideration or waive his

constitutional claim. Rather, in deference to Judge Nealon's concern that the Hungarian proceedings might moot the motion for reconsideration—and in an effort to get his son back as quickly and cost-effectively as possible—plaintiff consented to Judge Nealon "put[ing] it on hold." These facts do not support summary judgment.

### b. Waiver as a Matter of Law

■ The Court also concludes that even if the waiver defense could be factually supported at trial as a matter of law it does not defeat plaintiff's *Bivens* claim.

In *Stanley v. Illinois*, 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972), the Court considered and rejected a similar waiver claim in a similar context. In *Stanley*, an unwed father claimed that he had been denied due process when his children were declared wards of the state after the death of their mother. The procedure used by the Illinois courts effectively presumed that Stanley was an unfit parent because he was never wed to the children's mother, but gave him the opportunity to regain custody of his children through separate guardianship or adoption proceedings. The state contended that the availability of those separate proceedings, and Stanley's failure to avail himself of them, defeated his due process claim. The Court rejected that argument and refused to "embrace[ ] the general proposition that a wrong can be done if it can be undone." *Id.* at 647, 92 S.Ct. 1208. The Court rejected that argument because there is a "delay between the doing and the undoing," the unwed father would have different legal burdens in the later proceedings, and the later proceedings might be futile. *Id.* at 647–48, 92 S.Ct. 1208.

Defendants' waiver argument is essentially the same argument Illinois made in *Stanley,* and it fails for the same reasons. Like Illinois, defendants argue that their violation of plaintiff's due process rights should be excused because plaintiff failed to take steps that supposedly would have cured the violation. As in *Stanley,* however-

er, the motion for reconsideration would not have cured the injury that was done to plaintiff. Even if the motion for reconsideration was successful, it would have unnecessarily separated plaintiff from his son for an unjustifiable period of time, thereby "delay[ing] the doing and the undoing." *Cf. Stanley,* 405 U.S. at 647, 92 S.Ct. 1208. The motion for reconsideration also shifted the legal burden off of Ms. Kovacs and onto Mr. Egervary. In an ICARA hearing, the petitioner (here, Ms. Kovacs) has the burden of proving the essential elements of her claim by a preponderance of the evidence. *See* 42 U.S.C. § 11603(e)(1)(A). In a motion for reconsideration, the burden is on the movant (here, Mr. Egervary) to show "manifest" errors of law or fact or new evidence. *See generally Harsco Corp. v. Zlotnicki,* 779 F.2d 906, 909 (3d Cir.1985). Moreover, even if plaintiff had succeeded on his motion for reconsideration, it probably would have been futile. It is unclear whether under international law Judge Nealon could have ordered Oscar's return to this country. Even if he did, it is possible that Ms. Kovacs would have defied the Order and hid Oscar within Hungary, as it is alleged she did once before. *See* Egervary Aff. ¶ 8. This possibility is all the more likely since the Court's contempt powers— the only possible way of enforcing such an Order—are virtually meaningless to a foreign national with no property in this country and no intention of returning here. In other words, once plaintiff's due process rights were violated, the harm could not be undone. Plaintiff should not be penalized for allegedly failing to ask for the undoing.

Other courts faced with due process claims arising from child custody disputes have reached the same conclusion. In *Weller v. Dep't. of Soc. Servs.,* 901 F.2d 387 (4th Cir.1990), a father brought a Section 1983 claim against state officials after custody of his son was transferred to his ex-wife without any notice or opportunity to be heard. The court first concluded that Weller had a protectable liberty interest in the care and custody of his son. *Id.* at

391. The court then concluded that since Weller was accused of physically abusing his son the state was permitted to take custody of the child without prior notice, but Weller was nonetheless entitled to a postdeprivation hearing "shortly after the removal of the child." *Id.* at 393. The state argued—like defendants in this case—that Weller effectively waived his due process claim because he failed to "invoke the power of the juvenile court to issue a remedial order on his behalf." *Id.* The court found that even if such a remedy were available it did not satisfy due process. *Id.* at 394.

Similarly, in *Duchesne v. Sugarman,* 566 F.2d 817 (2d Cir.1977), a mother brought a Section 1983 claim after municipal welfare workers removed her children from her custody without notice or opportunity to be heard. Approximately twenty-seven months after the family had initially been separated, the mother attempted to regain custody by instituting habeas corpus proceedings. *Id.* at 824. Ten days after the habeas petition was filed, the state sought judicial ratification of the removal for the first time by instituting neglect proceedings. *Id.* In the civil rights action, the state argued that the failure to give notice and opportunity to be heard was not constitutionally defective because the habeas corpus remedy was available to the mother at all times. Like *Stanley* and *Weller,* the *Duchesne* Court was unwilling to put the burden of correcting the due process violation on the party whose rights had been violated and found that the mother had a viable claim. *Id.* at 828.

The waiver defense therefore also fails as a matter of law.

### 2. Collateral Attack

■ Defendants next argue that plaintiff's claim fails because it is an impermissible collateral attack on the May13th Order. *See* Rooney Mem. at 9.

The only case cited in support of this argument is *Heck v. Humphrey,* 512 U.S. 477, 114 S.Ct. 2364, 129 L.Ed.2d 383 (1994). In *Heck,* the Supreme Court ruled that a prisoner cannot maintain a Section 1983 suit that calls into question the lawfulness of his criminal conviction unless the conviction has been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Id.* at 487, 114 S.Ct. 2364. The Court based its ruling on the principle that "civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgements." *Id.* at 486, 114 S.Ct. 2364.

Defendants have offered no authority and no rationale for applying *Heck* to any action other than a civil action challenging a criminal conviction. The Supreme Court has "long expressed [ ] concerns for finality and consistency" in criminal cases and has "declined to expand opportunities for collateral attack" in criminal cases. *Id.* at 485–86, 114 S.Ct. 2364 (citing cases). The same is not true in civil cases, particularly where due process violations are at stake. A collateral attack is appropriate where "procedural defects are of sufficient magnitude to constitute a violation of due process, or, as sometimes more circularly put, where the defects are so unfair as to deprive the proceedings of vitality." *Fehlhaber v. Fehlhaber,* 681 F.2d 1015, 1027 (5th Cir.1982), quoting *Windsor v. McVeigh,* 93 U.S. 274, 23 L.Ed. 914 (1876) and *Eagles v. United States,* 329 U.S. 304, 67 S.Ct. 313, 91 L.Ed. 308 (1946).

Plaintiff has alleged serious due process violations that make a collateral attack appropriate in this case.[10]

### 3. Damages

■ Defendants next argue that plaintiff cannot sustain his claim because he has

---

**10.** The Court notes that it is unclear whether plaintiff's due process claim is properly characterized as a collateral attack. A due process claim "does not depend upon the merits of claimant's substantive assertions." *Carey v. Piphus,* 435 U.S. 247, 266, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). Therefore, decision of this case in plaintiff's favor would not

suffered no compensable damages. Specifically, they claim that the only inquiry relevant to the question of damages is "whether plaintiff's son, Jonathan,[11] would have been returned to his mother in Hungary regardless of the actions of the U.S. Department of State or any of the defendants." Nallin Mem. at 13.

The Supreme Court considered the availability of damages for due process violations in *Carey v. Piphus*, 435 U.S. 247, 98 S.Ct. 1042, 55 L.Ed.2d 252 (1978). In *Carey*, a group of elementary and secondary students claimed they were suspended from school without due process and brought a Section 1983 suit seeking actual and punitive damages. The Court held that "[b]ecause the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed ... the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* at 266, 98 S.Ct. 1042. Accordingly, damages in this case do not depend upon proof that the ICARA and custody proceedings would ultimately have resulted in Oscar's return to his mother in Hungary.[12]

Plaintiff is at least entitled to an award of nominal damages, even if the result of the *ex parte* ICARA proceeding was "justified" and even if plaintiff "did not suffer any other actual injury."[13] *Id.*

### 4. Immunity for the Return of Kidnaped Children

■ Defendants' final argument is that "courts have been reluctant to impose liability upon those participating in judicial process to secure the return of kidnapped [sic] or abused children." Rooney Mem. at 8; Nallin Mem. at 12–13.

This argument ignores the substantial body of case law—cited throughout this Memorandum—in which courts have recognized claims against government agents who allegedly removed children from their parents' custody without due process. *See Hollingsworth*, 110 F.3d at 740; *Jordan*, 15 F.3d at 351; *Weller*, 901 F.2d at 396; *Doe*, 858 F.2d at 1329; *Robison*, 821 F.2d at 921; *Hooks*, 771 F.2d at 942–43; *Lossman*, 707 F.2d at 291; *Duchesne*, 566 F.2d at 829. Although these claims have not always succeeded, none failed because of the blanket immunity that defendants claim here.

Moreover, none of the four cases cited by defendants support blanket immunity

---

mean that the petition before Judge Nealon was incorrectly decided.

**11.** Defendants consistently refer to young Oscar in their briefs as "Jonathan," his middle name. Plaintiff points out that Oscar has never been referred to by his middle name, even in court documents. *See* Plaintiff's Mem. at 4 n. 1.

**12.** Plaintiff has suggested that if he had been afforded due process in the ICARA proceedings Oscar's custody would have been decided in this country, and he would have been awarded permanent custody. It is unclear whether plaintiff could seek recovery for such consequential damages at trial. Proceeding on that theory would raise complex issues regarding the propriety of conducting a "trial within a trial," the sufficiency of arguably speculative evidence of what other courts "might have done," and jurisdictional questions regarding this Court's capacity to

hear the merits of a custody claim. *See generally Solomon v. Solomon*, 516 F.2d 1018, 1024–25 (3d Cir.1975) (discussing the domestic relations exception to federal subject matter jurisdiction). The Court therefore takes no position on the availability of consequential damages.

**13.** Defendants also argue that plaintiff is "unable to recover for any alleged emotional distress in the absence of supporting medical testimony as a matter of Pennsylvania law." Nallin Mem. at 14 n. 4. In *Carey*, the Supreme Court specifically recognized the availability of damages for emotional distress in due process claims. *See Carey*, 435 U.S. at 263, 98 S.Ct. 1042. To the extent that this case is a federal *Bivens* claim, Pennsylvania law is irrelevant to how those damages are assessed. However, if plaintiff's conspiracy claim is a state claim, Pennsylvania law will likely apply. The Court therefore takes no position on this issue.

for "those participating in judicial process to secure the return of kidnapped [sic] or abused children." In fact, none of the four even deals with the return of kidnaped children.

*Callahan v. Lancaster–Lebanon Intermediate Unit 13*, 880 F.Supp. 319 (E.D.Pa. 1994), was a Section 1983 suit brought by parents who were temporarily wrongly deprived of custody of their autistic son because of unsubstantiated allegations of child abuse based upon the results of a controversial testing procedure. The court entered summary judgment against the parents, finding that there was no violation of their due process rights. *Id.* at 332–33. However, in that case the child was allegedly in imminent threat of harmful sexual abuse and the parents received a state-initiated postdeprivation hearing within seventy-two hours. *Id.* at 333. When the state could not meet its burden of proving abuse at that hearing, the child was immediately returned to his parents. *Id.* *Callahan* therefore reinforces the Court's previous analysis, and does not support the broad immunity that defendants claim.

In *Lord v. Murphy*, 561 A.2d 1013 (Me. 1989), a father in Kentucky brought a Section 1983 claim against social workers in Maine who failed to give him notice of his children's placement in foster care after their removal from their mother's home. The father alleged that the social workers ignored a custody decree that had been entered in his favor in Kentucky and therefore violated state and federal law. The majority did not address the question of immunity for the social workers. Instead, the court simply found that the state law violations alleged could not form the basis of a Section 1983 suit. *Id.* at 1017. *Lord* therefore adds nothing to this case since it is unquestionable that due process violations can form the basis of a *Bivens* suit.

In *Cosner v. Ridinger*, 882 P.2d 1243 (Wyo.1994), a noncustodial father brought claims for intentional or negligent interference with parental rights, intentional inflic-tion of emotional distress, and abuse of process against his ex-wife, her second husband, and her attorneys. The court held that Wyoming did not recognize the tort of interference with parental rights and that there was an insufficient factual underpinning for the emotional distress and abuse of process claims. *Id.* at 1249. *Cosner* therefore did not consider a due process claim and did not find the broad immunity that defendants argue for here.

Finally, in *Offenhartz v. Cohen*, 168 A.D.2d 268, 562 N.Y.S.2d 500 (1990), a 12–year–old brought claims against her mother's attorney after the mother attempted to abduct the child. The plaintiff claimed that the attorney had advised her mother to attempt the abduction. The court affirmed the dismissal of the claims against the attorney because there was no privity between the plaintiff and the attorney and therefore there could be no negligence claim. The court further ruled that the attorney could not be held liable for aiding and abetting the mother's assault because he took no overt act in furtherance of the assault. The defendant attorney in *Offenhartz* was not accused—as here—of directly effectuating a violation of plaintiffs' due process rights.

None of these cases support defendants' claim of blanket immunity for individuals involved in judicial proceedings related to child custody disputes. The Court is sympathetic to the notion of protecting individuals who in good faith take reasonable steps to protect children from parents who threaten their well-being. That sympathy, however, must be weighed against the "absolute" right to procedural due process, *see Carey*, 435 U.S. at 266, 98 S.Ct. 1042, and the serious allegations in this case, including the as-yet unproven allegation that officers of the Court misrepresented material issues of law and fact to a federal judge. With these factors in mind, the Court declines defendants' invitation to find blanket immunity for their actions.

## IV. CONCLUSION

The essential facts regarding defendants' liability on the *Bivens* claim are not

in dispute. However, plaintiff has not moved for summary judgment in his favor on that issue, and the Court cannot enter such an order *sua sponte* unless defendants have been given notice and an opportunity to brief the issue. *See Otis Elevator Co. v. George Washington Hotel Corp.,* 27 F.3d 903, 910 (3d Cir.1994). The Court will therefore order that defendants submit such briefing within 20 days.

An appropriate Order follows.

### ORDER

AND NOW this day of January, 2000, in consideration of defendants' motion for summary judgment, and plaintiff's response thereto, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that defendants' motion is DENIED. It is further ORDERED that defendants shall within 20 days submit briefs regarding the entry of summary judgment in favor of the plaintiff on the question of liability, and plaintiff may respond within 20 days thereafter.